**JOHNSON FISTEL, LLP**
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonfistel.com
Kristen O'Connor, Esq. (SBN 305113)
KristenO@johnsonfistel.com
Chase M. Stern, Esq. (SBN 290540)
ChaseS@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

**ROSTOW & AUSTER, LLP**
Reza I. Gharakhani, Esq. (SBN 162690)
Gharakhani@rostow.com
2049 Century Park East, Suite 3850
Los Angeles, CA 90067
Telephone: (310) 772-0080
Facsimile: (310) 772-0822

*Attorneys for Plaintiff Edward R. Monfort*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD R. MONFORT,<br><br>Plaintiff,<br><br>v.<br><br>ADOMANI, INC., a Delaware Corporation;<br>JAMES L. REYNOLDS; MICHAEL K.<br>MENEREY; ROBERT E. WILLIAMS;<br>KEVIN G. KANNING; DENNIS DI RICCO;<br>AND DOES 1-50;<br><br>Defendants. | Case No.: 5:18-CV-05211-LHK<br><br>**PLAINTIFF EDWARD R. MONFORT'S FIRST AMENDED COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **FRAUD**<br>3. **FRADULENT INDUCEMENT TO CONTRACT**<br>4. **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.     Edward R. Monfort ("Monfort"), is the founder of Adomani, Inc. ("Adomani" or the "Company") and is the author of the patents that were used to start Adomani.

2.     James L. Reynolds ("Reynolds"), Michael K. Menerey ("Menerey"), Robert E. Williams ("Williams"), Kevin G. Kanning ("Kanning"), and Dennis Di Ricco ("Di Ricco") (collectively referred to herein as the "Individual Defendants" and with Adomani as the "Defendants"), worked in concert to appropriate Monfort's industry clout and intellectual property for purposes of establishing and exciting a market for Monfort's technology.  Then, after touting him like a prized show horse, they swindled his stock position, fraudulently induced him to enter into an underhanded employment agreement, besmirched his reputation, and used investor dollars to capitalize other ventures.

3.     Defendants systematically worked to cement their wrongful conduct by terminating Monfort as a subterfuge for placing beyond Monfort's reach anything of value that might be used to make him whole for the financial and reputational harm done to him.

4.     Monfort brings this action to recover the damages that Defendants' actions caused him.

**PARTIES**

5.     Monfort is an individual residing in the County of Sarasota in the State of Florida.

6.     Defendant Reynolds is, and at all times mentioned herein was, an individual residing in the State of California.  Reynolds has served as Adomani's President and CEO since September 2014 and a Director since July 2014.

7.     Defendant Menerey is, and at all times mentioned herein was, an individual residing in the State of California.  Menerey has served as Adomani's Chief Financial Officer since March 2016 and a Director since January 2017.

8.     Defendant Williams is, and at all times mentioned herein was, an individual residing in the State of California.  Williams has served as Adomani's Vice President and a Director since November 2012.

9.     Defendant Kanning is, and at all times mentioned herein was, an individual residing in the State of California.  Kanning previously served as the Chief Operating Officer and Secretary from November 2012 through February 2017, and a Director from November 2012 until June 2017.  Kanning has served as the Company's Vice President of Business Development and Vice President of Investor Relations since February 2017.

10.    Defendant Di Ricco was at all times mentioned herein an individual residing in the State of California.  According to the Company's S-1 Registration Statement filed with the U.S. Securities and Exchange Commission ("SEC") on October 16, 2017 (the "2017 S-1"), the Company signed an advisor agreement with Di Ricco in 2016 to provide consulting services to the Company.  The 2017 S-1 also indicated that the Company and Di Ricco terminated their consulting relationship in 2017.

11.    Adomani is a Delaware corporation with its principal executive offices at 4740 Green River Road, Suite 106, Corona, California 92880.  Adomani's common stock is traded on the NASDAQ under the ticker symbol "ADOM."

12.    Monfort is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names pursuant to Cal. Civ. Proc. Code § 474.  Monfort is informed and believes, and based thereon, alleges that each of the Defendants designated herein is legally responsible in some manner for the unlawful acts and occurrences complained of herein, whether such acts were committed intentionally, negligently, recklessly, or otherwise, and that each of the Defendants thereby proximately caused the injuries and damages to Monfort as herein alleged.  Monfort will seek leave of Court to amend this complaint to reflect the true names and capacities of the Defendants when they have been ascertained and become known.

13.    Monfort alleges on information and belief that at all times relevant herein, each of the Defendants was the agent and/or employee of each of the remaining Defendants and in doing the things alleged herein was acting within the scope of such agency and employment. Monfort further alleges on information and belief that the conduct of each of the Defendants as alleged herein was ratified by each of the other Defendants and the benefits thereof were accepted

1   by each of the Defendants.  Consequently, the acts of each Defendant are legally attributable to

2   the other Defendants and all Defendants are jointly and severally liable to Monfort for the loss

3   sustained as a proximate result of the conduct of the Defendants' agents, servants, and/or

4   employees.

5         14.     The Individual Defendants combined and conspired for an unlawful purpose,

6   *i.e.*, to make intentional misrepresentations to Monfort, to cause Adomani to breach certain

7   contracts with Monfort, to deprive Monfort of his lawful interest in Adomani, to fraudulently

8   induce Monfort to enter into an underhanded employment agreement, and to aid and abet others

9   in committing the foregoing acts, all for their own personal benefit.

10        15.     Each of the Individual Defendants engaged in one or more overt acts in

11  furtherance of their common scheme, as alleged above.  Because the Individual Defendants

12  participated in the scheme as co-conspirators, each is chargeable with the wrongful acts

13  committed by others in furtherance of the conspiracy.  As a direct and proximate result of the

14  civil conspiracy, Monfort has been injured by the Individual Defendants in an amount to be

15  proven at trial.

16  **JURISDICTION AND VENUE**

17        16.     Jurisdiction in this Court is proper under 28 U.S.C. §1332.

18        17.     Venue in this Court is proper under 28 U.S.C. § 1441(a), having been removed

19  from state court "to the district court of the United States for the district and division embracing

20  the place where such [state court] action is pending."

21  **FACTUAL ALLEGATIONS**

22        18.     Monfort is a respected engineer and prototype developer for advanced zero

23  emission vehicle solutions and the author of five patents.  Monfort authored and was successfully

24  awarded Patent No. 8,169,115 for an electric drive train on May 1, 2012.

25        19.     Di Ricco, a stock promoter, located Monfort on the Internet while conducting

26  due diligence for another company engaged in cryogenic chamber technology.   Di Ricco

27  proposed that he and Monfort work together on building Adomani to manufacture an electric

28  drive train.

20.     Monfort agreed to partner with Di Ricco in the new venture and, in April 2012, agreed orally and through a series of emails with Di Ricco that 60% of the putative Company would be owned by Monfort and 40% would be owned by Di Ricco.  Di Ricco and Monfort agreed that Monfort would have the title of CEO while Di Ricco was making the business decisions and was serving as Adomani's stock promoter.

21.     Di Ricco selected a team that would ultimately oust both Monfort and then Di Ricco from the Company.  Di Ricco first selected Williams and Kanning to serve as Vice President and Vice President of Business Development and Investor Relations of the venture, respectively.  Di Ricco and Monfort formed an LLC as a predecessor to Adomani, for which Di Ricco was able to quickly procure investors based on the uniqueness of Monfort's technology and his patent.  Di Ricco told Monfort that he planned to eventually take Adomani public and repeatedly assured Monfort that he would be the majority shareholder.  As alleged below, this misrepresentation was later adopted by the Individual Defendants.

22.     After Monfort successfully converted a Ram truck to a hybrid for proof of his drive train concept and a 100% all-electric Ford Ranger, Di Ricco met with Monfort in the summer of 2012 at Buck's of Woodside Restaurant ("Buck's") in a suburb of San Jose to convince him to convert the LLC to a Florida corporation and said it was on advice of a lawyer Di Ricco selected.  During this conversation, Di Ricco verbally reassured Monfort—as founder of Adomani and in consideration for his continued services as an inventor and technology expert, and the future assignment to Adomani of Monfort's patents—that he would remain the majority shareholder in the corporation which would be fully memorialized in a series of subscription agreements and option awards (the "July 2012 Agreement").

23.     Di Ricco abundantly reassured Monfort in emails thereafter—on which Williams and Kanning were carbon copied—that "the structural change. . . .will not affect anyone."

24.     On August 6, 2012, Di Ricco caused Adomani, Inc. to be incorporated in Florida. According to Adomani's Articles of Incorporation dated 8/6/12, Adomani was authorized to issue 100,000,000 shares of common stock at $0.002 par value per share.

25.     Also on August 6, 2012, in furtherance of Monfort's and Di Ricco's deal that Monfort would be awarded a substantial equity position in Adomani pursuant to the July 2012 Agreement, Monfort was awarded 2 million shares of common stock as evidenced in a fully executed subscription agreement.  Ex. A.  On the very next day, August 7, 2012, Monfort was awarded another 18.5 million shares of common stock as evidenced in two fully executed subscription agreements.  Exs. B-C.

26.     Less than two weeks later, on August 22, 2012, Monfort was awarded another 10 million shares of common stock as evidenced in a fully executed subscription agreement. Ex. D.   Less than two weeks after that, on September 11, 2012, Monfort was awarded another 7.5 million shares of common stock in a fully executed subscription agreement, bringing his equity position to 38 million shares of common stock.  Ex. E.

27.     On September 21, 2012, Monfort, in furtherance of and in reliance on the July 2012 Agreement, assigned Patent No. 8,169,115 and future patents to Adomani, which Di Ricco, Kanning, and Williams verbally indicated to Monfort would be used to attract investors and collateralize loans for Adomani.

28.     On November 1, 2012, in furtherance of the July 2012 Agreement, Monfort was given an option to purchase 12 million shares of common stock at $0.10 per share.  Ex. F.  Shortly thereafter, Monfort built an electric ranger, which impressed and excited putative investors. Di Ricco gleaned from investor feedback that there was considerable market interest— particularly from California school districts—in electric school buses.  Accordingly, in early 2013 Monfort innovated and created an operating electric school bus that could travel 42 miles with a top speed of 75 miles per hour.  The bus was the first of its kind—the only operating all-electric school bus ever built in the world.  However, the battery pack was very large and expensive.

29.     By the end of 2013, Monfort had innovated and created a second bus, the "Gilroy," which could accommodate 80-88 passengers.  While the Gilroy could only travel 25 miles, it used a smaller and less expensive battery pack, which was the only feasible design given Monfort's $50,000 budget to build the Gilroy.  Adomani shipped the Gilroy from Florida

1    to Gilroy, California, which cost Adomani approximately $15,000.  The Gilroy was used to pick

2    up and drop off children for the school season and never broke down.

3        30.    In late 2013, Di Ricco engaged Issuer Direct Corporation ("Issuer Direct") to act

4    as Adomani's stock transfer agent.  Eddie Tobler ("Tobler"), acting as the VP of Issuer Direct,

5    was tasked with handling issuance of the stock certificates.  Specifically, in an email dated

6    November 18, 2013, Di Ricco sent Tobler a document that would be later filed with the SEC and

7    explained that it "shows all of the correct names of the shareholders."  Tobler explained that

8    rather than issue stock certificates, they "decided to do book entry for the time being" and he

9    attached "the position report that we setup on [December 5, 2013] and placed everything into

10   book entry."  Consistent with the information that Di Ricco provided, the position report reflected

11   that Monfort was the largest shareholder, owning 34,280,000 shares of common stock.

12       31.    In early 2014, Di Ricco selected Reynolds to be hired as the CEO.  Reynolds,

13   Kanning, and Williams planned to move Monfort out of the business side of Adomani altogether.

14       32.    In or around March 2014, Di Ricco contacted Williams and Kanning to set up a

15   meeting with Monfort, Williams, and Kanning at Buck's to persuade him to agree that Adomani

16   needed to hire Reynolds—the former CEO of commercial, transit, school bus sales company A-

17   Z Bus—as Adomani's CEO and demote Monfort to Adomani's Chief Technology Officer

18   ("CTO").

19       33.    They all promised Monfort that he would continue as the largest shareholder.

20   This promise was false.  In truth, the Individual Defendants intended to obtain control of the

21   company with Reynolds and oust Monfort altogether.

22       34.    Based on these representations by Williams, and Kanning, during the April 2014

23   meeting of the Board of Directors, Monfort voted to install Reynolds as Adomani's CEO.  Had

24   he known the truth, he would not have done so.

25       35.    Thereafter, Reynolds, Monfort, and others traveled extensively to engage in

26   investor roadshows, industry speeches, trade shows, shareholder meetings, and investor

27   meetings, where Reynolds touted Monfort as the expert in Adomani's technology and used

28   Monfort's industry clout and electric vehicle ("EV") prowess to attract and excite investors.

36.     Dozens of investors traveled to California to ride the Gilroy, the only working electric school bus on the market.  Considerable press and media buzz ensued, further exciting and growing the market.

37.     Reynolds, Kanning, and Williams persuaded Monfort to author as many patents as possible and begin developing additional AC technology which would rival Tesla's technology.

38.     In exchange for Monfort's services and in furtherance of the July 2012 Agreement, Monfort was awarded an option to purchase another 3 million shares of preferred stock at $0.10 per share on June 1, 2014.  Ex. G.[1]

39.     In Adomani's S-1 Registration Statement filed with the SEC on 11/12/14 and signed by Williams, Kanning, Reynolds, and Monfort, Monfort was listed as the owner of 34,280,000 shares of common stock and through the fiscal year ended December 31, 2013 having the option to purchase 12,000,000 shares of common stock at $0.10 per share.

40.     The S-1 stated that "We currently have 81,300,500 shares of common stock outstanding."  On November 20, 2015, in response to an email from Monfort asking for Di Ricco's confirmation of the "amount for common and preferred [stock Monfort has]," Di Ricco replied: "You have 15 million stock options . . . plus [y]ou have 33 million issued shares after you gave away 3 million shares."[2]  This representation was adopted by the other Individual Defendants.

---

[1]  Adomani later terminated the Stock Option Plan pursuant to which these options were issued. Ex. J.  On November 28, 2016, Adomani and Monfort entered into a new binding written contract whereby Monfort was granted an option to purchase 3 million shares of common stock at $0.10 (the "November 28, 2016 Option Agreement").  Although the November 28, 2016 Option Agreement is not in Monfort's possession, Adomani referenced and conceded its existence in its S-1 filed with the SEC on 11/12/14 ("On June 1, 2014, we granted Mr. Monfort an option to purchase 3,000,000 shares of Common Stock pursuant to the 2012 Preferred Stock Option Plan.  In connection with the termination of the 2012 Preferred Stock Option Plan, on November 28, 2016, the Board of Directors subsequently canceled such option and issued to Mr. Monfort a new option to purchase 3,000,000 of Common Stock, with a vesting commencement date of June 1, 2014.").

[2]  Monfort elected to give approximately 3 million of his shares to his family.

41.     Di Ricco spent much of 2015 raising capital for Adomani. Investors were amassing and shares of common stock were issued rapidly. Upon information and belief, Reynolds was advised that too many shares of common stock were outstanding for a public offering and that Adomani should consider doing a reverse stock split or otherwise reduce the number of shares of common stock outstanding. And so, with an IPO on the horizon, Reynolds conspired with Kanning, Williams, and Adomani's newly-hired Chief Financial Officer, Menerey, to rob the easiest target of their shares of common stock to avoid a reverse stock split: Monfort, whom they likened to "an idiot savant. Brilliant in one thing and childlike in others."

42.     On May 4, 2016 and throughout 2016, Monfort requested all documentation from the Company evidencing his shares of common stock and/or options to purchase common stock in the Company. Reynolds told Monfort that no documents existed evidencing that he owned more than 30 million shares of common stock.

43.     In early 2016, Monfort engaged the services of the law firm of Macfarlane Ferguson & McMullen in Tampa, Florida; specifically, Monfort engaged attorney Julian Paul Raymond ("Raymond").

44.     Shortly after being engaged by Monfort, Raymond requested all documentation from Adomani's in-house lawyer, Conrad Lysiak ("Lysiak"), evidencing Monfort's ownership of shares of common stock and/or options to purchase common stock in the Company. Lysiak represented to Raymond that no documents existed evidencing any ownership of Adomani's shares of common stock by Monfort. Another of Adomani's lawyers also stated to Raymond that representations in the Company's S-1 Filing that Monfort was the owner of 34,280,000 shares of common stock were made in error and that the Company would correct the S-1 Filing.

45.     Based on the foregoing representations by the Company to Monfort and his counsel, Monfort did not believe any documents evidencing his ownership of 38 million shares of common stock existed. Consequently, Monfort signed an employment agreement on June 23, 2016 which appended a Release of Claims in order to accommodate the Company's initial public offering and monetize his option awards in the amount of 15,000,000 stock. Ex. H.

46.     On July 25, 2016, Menerey emailed Monfort stating that "in order to clean up our files before the IPO, I need you to void or cancel all [of your] subscription agreements." Menerey's email refreshed Monfort's recollection that documents evidencing his majority equity position in the Company existed.  Monfort did not void or cancel the subscription agreements. Four days later, on July 29, 2016, in an apparent attempt to induce Monfort's cooperation, Adomani issued Monfort another 2 million shares of common stock in a fully executed subscription agreement.  Ex. I.  With these additional shares of common stock, Monfort was granted 40 million shares of common stock.

47.     In November 2016, Defendants caused Adomani to be reincorporated in Delaware.  On December 21, 2016, Defendants caused Adomani to list Monfort as having only 4 million shares of common stock and 15 million options to purchase common stock in its Preliminary Offering Circular filed with the SEC.  Monfort, effectively robbed of his equity position on paper, was incensed.  He sent a series of emails to Reynolds and Menerey demanding to know what happened to his stock.

48.     In June of 2017, in pursuit of his conspiracy with the other Individual Defendants to oust the founder of Adomani, Reynolds caused Adomani to terminate Monfort.  However, to pacify Monfort and deter him from taking actions that may have prevented Adomani from going public, Reynolds terminated him "with pay."

49.     Defendants caused Adomani to go public on June 15, 2017.

50.     In March 2018, shortly after Monfort tried to exercise his stock options, Reynolds sent Monfort a letter stating that Monfort was terminated purportedly "for cause."  Reynolds, acting in concert with the other Individual Defendants, did so in order to wrongfully deprive Monfort of his stock options.

## COUNT I

### BREACH OF CONTRACT
### (Against Adomani)

51.     Monfort re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

52.     On or about August 6, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 2,000,000 shares of common stock.  Ex. A.

53.     On or about August 7, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 9,500,000 shares of common stock.  Ex. B.

54.     On or about August 7, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 9,000,000 shares of common stock.  Ex. C.

55.     On or about August 22, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 10,000,000 shares of common stock.  Ex. D.

56.     On or about September 11, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 7,500,000 shares of common stock.  Ex. E.

57.     On or about November 1, 2012, Monfort and Adomani entered into a binding written contract whereby Monfort was granted an option to purchase 12,000,000 shares of common stock at $0.10.  Ex. F.

58.     On or about June 1, 2014, Monfort and Adomani entered into a binding written contract whereby Monfort was granted an option to purchase 3,000,000 shares of preferred stock at $0.10.  Adomani later terminated the Stock Option Plan pursuant to which these options were issued and, on November 28, 2016, entered into a new binding written contract whereby Monfort was granted an option to purchase 3,000,000 shares of common stock at $0.10.  Exs. G, J.[3]

59.     On or about July 29, 2016, Monfort and Adomani entered into a binding written contract whereby Monfort was granted 2,000,000 shares of common stock.  Ex. I.

60.     Monfort directly or indirectly performed all of the acts the foregoing contracts required of him (including by paying for the shares of common stock through assignment of Monfort's patents which were independently valued) except where wrongfully prevented from doing so by Adomani.

61.     Despite the fact that these contracts entitle Monfort to 40 million shares of Adomani common stock and options to purchase 15 million shares of common stock at $0.10,

---

[3] *See supra*, n. 1.

PLAINTIFF EDWARD R. MONFORT'S FIRST AMENDED COMPLAINT
Case No.: 5:18-CV-05211-LHK

1  Defendants have only given Monfort 4 million shares of common stock.  Defendants have
2  inexcusably breached the contracts by failing to deliver all of the shares of common stock
3  promised thereunder, and by wrongfully denying Monfort's entitlement to the shares of common
4  stock.

5        62.    As a result of the above-alleged breaches, Monfort has suffered actual damages
6  in an amount to be proven at trial.

7        63.    Defendants' breach of these contracts was a substantial factor in causing
8  Monfort's damages.

9  **COUNT II**

10  **FRAUD**
**(Against the Individual Defendants)**
11

12        64.    Monfort re-alleges and incorporates by reference each and every allegation
13  contained in the paragraphs above.

14        65.    The Individual Defendants conspired to and did intentionally represent to
15  Monfort that Monfort, in consideration for his continued services as an inventor and technology
16  expert, and the future assignment to Adomani of Monfort's patents, 1) would be conferred
17  40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock;
18  and 2) he was and would remain the majority shareholder in Adomani.

19        66.    More specifically, the Individual Defendants represented to Monfort that the
20  following facts were true:

21        i.    By oral representations beginning in 2014 through early 2016, each of the
22      Individual Defendants repeatedly represented to Monfort that he was and would remain
23      the majority shareholder in Adomani;

24        ii.    By oral agreement in July 2012 between Monfort and Di Ricco that
25      Monfort would be the majority shareholder in Adomani which would be fully
26      memorialized in a series of subscription agreements and option awards, which was later
27      ratified and/or endorsed by the Individual Defendants through the written and oral
28      agreements below;

11

iii. By Subscription Agreement on 8/6/2012 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of 2,000,000 shares of common stock;

iv. By Subscription Agreement on 8/7/2012 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of 9,500,000 shares of common stock;

v. By Subscription Agreement on 8/7/2012 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of 9,000,000 shares of common stock;

vi. By Subscription Agreement on 8/22/12 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of 10,000,000 shares of common stock;

vii. By Subscription Agreement on 9/11/12 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of 7,500,000 shares of common stock;

viii. By Option Agreement on 11/1/12 and, therafter by oral representations beginning in 2012 through early 2016, that Monfort was the owner of an option to purchase 12 million shares of common stock at $0.10;

ix. By oral representations in March of 2014 through 2017, by Williams and Kanning that Monfort would continue as the largest shareholder, that he would "hold [Reynolds'] hand," and that Monfort would not lose his stock position or "power;"

x. By Option Agreement on 6/1/14 through 2017, that Monfort was the owner of an option to purchase 3 million shares of preferred stock at $0.10;

xi. By S-1 Registration Statement filed with the SEC on 11/12/14 and signed by Williams, Kanning, Reynolds, and Monfort, that Monfort was the owner of 34,280,000 shares of common stock and the option to purchase 15 million shares of common and preferred stock;

xii.     By oral representation by Reynolds in Monfort's office in late 2014 that Monfort was and would remain the majority shareholder in Adomani;

xiii.    By repeated oral representations by each of the Individual Defendants in early 2016 to Monfort and Monfort's counsel that no documentation existed evidencing Monfort's ownership of more than 30 million shares of common stock; and

xiv.     By Option Agreement on 11/28/16, signed by Menerey that Monfort was the owner of an option to purchase 3 million shares of common stock at $0.10.

67.     Despite these representations, Defendants never intended to honor the agreements conferring 40,000,000 shares of common stock or options to purchase 15,000,000 shares of common stock in the Company and never intended that Monfort he would continue as the largest shareholder.  In truth, the Individual Defendants worked in concert to obtain control of Adomani, misrepresent the existence of documentation evidencing Monfort's majority equity position, oust Monfort altogether, and deprive him of his equity in the Company.

68.     The Individual Defendants knew the representations alleged herein were false when made, or made the representations recklessly and without regard for their truth, and intended that Monfort rely on these representations.

69.     Monfort reasonably relied on these representations and, in furtherance thereof, continued his services as an inventor and technology expert, assigned Adomani his patents, and voted to approve each of the Individual Defendants in taking positions with Adomani.

70.     Had Monfort known the truth, he would not have continued his services as an inventor and technology expert, assigned Adomani his patents, and voted to approve each of the Individual Defendants in taking positions with Adomani.

71.     As a consequence of the above-alleged reliance, Monfort has suffered actual damages in an amount to be proven at trial and his reliance on the Individual Defendant's promises was a substantial factor in causing his damages.

72.     The Individual Defendants' actions were wrongful, willful, oppressive, malicious, and done with the intent to harm Monfort.  Monfort is thus entitled to an award of

1  punitive damages in an amount sufficient to punish and deter the Individual Defendants from

2  engaging in such conduct.

3  <u>**COUNT III**</u>

4  **FRAUDULENT INDUCEMENT TO CONTRACT**
   **(Against the Individual Defendants)**

5

6  73.     Monfort re-alleges and incorporates by reference each and every allegation

7  contained in the paragraphs above.

8  74.     In early 2016, each of the Individual Defendants falsely represented to Monfort

9  and Monfort's counsel that no documentation existed evidencing Monfort's ownership of more

10  than 30 million shares of common stock.

11  75.     The Individual Defendants knew or should have known that these representations

12  were false because Adomani had in its possession four fully-executed subscription agreements

13  signed by Kanning and Monfort, as evidenced by Menerey's email to Monfort on July 20, 2016,

14  which attached all four subscription agreements.

15  76.     The Individual Defendants made these misrepresentations with the intent to

16  induce Raymond and Monfort's reliance and to deprive Monfort of his majority equity position

17  in the Company.   Unaware of the Individual Defendants' intentions, Monfort executed an

18  employment agreement on June 23, 2016 which appended a Release of Claims in order to

19  accommodate the Company's initial public offering and monetize his option awards to

20  purchase 15,000,000 shares of common stock in the Company.

21  77.     As a direct and proximate result of the Individual Defendants' false

22  representations, Monfort suffered economic injury and damages in an amount to be proven at

23  trial.

24  78.     The Individual Defendants' actions were wrongful, willful, oppressive,

25  malicious, and done with the intent to harm Monfort.  Monfort is thus entitled to an award of

26  punitive damages in an amount sufficient to punish and deter the Individual Defendants from

27  engaging in such conduct.

28

## COUNT IV

### DECLARATORY RELIEF
### (Against All Defendants)

79.     Monfort re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

80.     Monfort has repeatedly demanded 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock in the Company from Adomani, to which he alleges he is contractually and legally entitled.

81.     Defendants have repeatedly denied Monfort's entitlement to, and/or ownership of, 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock.

82.     A present, actual, and justiciable controversy exists between on the one hand Monfort, and on the other hand Defendants, concerning Monfort's contractual entitlement to, and/or ownership of, 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock.

83.     Because the present and actual controversy concerning Monfort's contractual entitlement to, and/or ownership of, 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock, is ripe for judicial determination, a judicial determination of the parties' respective rights and obligations is necessary and appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Monfort prays for judgment as follows:

1.     For a declaration stating Monfort is contractually entitled to, and/or the owner of, 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock, or the value thereof;

2.     For general, compensatory, and/or special damages in an amount to be proven at trial;

3.     For punitive damages, in an amount sufficient to punish and deter Adomani;

1        4.        For punitive damages, in an amount sufficient to punish and deter the Individual

2    Defendants;

3        5.        For rescission of the 2016 employment agreement and Release of Claims;

4        6.        For interest at the appropriate rate on the sums awarded;

5        7.        For costs of suit and attorneys' fees as allowed by law; and

6        8.        For any and all such other and further relief as the Court may deem appropriate.

7                           **DEMAND FOR JURY TRIAL**

8        Monfort hereby demands a jury trial.

9                                        Respectfully Submitted,

10   Dated:  March 25, 2019                    **JOHNSON FISTEL, LLP**

11

12                           By:   */s/ Frank J. Johnson*
                                  FRANK J. JOHNSON

13                                KRISTEN O'CONNOR
                                  CHASE M. STERN
14                                655 West Broadway, Suite 1400
                                  San Diego, CA 92101
15                                Telephone: (619) 230-0063
                                  Facsimile: (619) 255-1856
16                                FrankJ@johnsonfistel.com
                                  KristenO@johnsonfistel.com
17                                ChaseS@johnsonfistel.com

18                                **ROSTOW & AUSTER, LLP**
                                  Reza I. Gharakhani, Esq. (SBN 162690)
19                                2049 Century Park East, Suite 3850
                                  Los Angeles, CA 90067
20                                Telephone: (310) 772-0080
                                  Facsimile: (310) 772-0822
21                                Gharakhani@rostow.com

22                                *Attorneys for Plaintiff Edward R. Monfort*

23

24

25

26

27

28

PLAINTIFF EDWARD R. MONFORT'S FIRST AMENDED COMPLAINT
Case No.: 5:18-CV-05211-LHK

# EXHIBIT A

## SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares (the "Shares") of **ADOMANI, Inc.**, a Florida corporation, (the "Company") set forth on the signature page of this Subscription Agreement at a price of **$0.002** per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned is familiar with the business of the Company.

The undersigned agrees and represents as follows:

1.      Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)      That the undersigned is aware of the following:

(1)      The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to, those set forth in the Executive Summary;

(2)      The Company is newly formed and has been operating at a loss and may do so for the foreseeable future.

(3)      There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)      No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)      Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)      That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from

Company operations or otherwise will be made to Share Owners by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

   (c) That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

   (d) That the undersigned has talked to the Managers and is familiar with the Company's business model and intended operations, this Subscription Agreement, and all other documents in connection therewith. The undersigned confirms that all documents, records and books pertaining to the investment in the Company have been made available or offered to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

   (e) That the undersigned has relied only on the information furnished by the Managers and that no written or oral representation or information that is in any way inconsistent with the statements of the Managers and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

   (f) That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

   (g) That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment, or is familiar with the Managers;

   (h) That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities, has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

   (i) That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

   (j) That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an

exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is true, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the statements and information furnished from the Managers reflects the Company's current intentions and estimates at the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.     Indemnification.  The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, Share Owners, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.     Entity Investors.  If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity); (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the

investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment); and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.     <u>Revocation.</u>   The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for Shares for a period of 120 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.     <u>Certain Securities Law Matters.</u>

(a)     The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act.  The undersigned will cause any proposed purchaser, assignee, transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)     Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any Share split, dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> **THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.   SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED   IN   THE   ABSENCE   OF   SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION   AND   PROSPECTUS   DELIVERY REQUIREMENTS OF SAID ACT.   COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.**

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)     The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.     Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)     Name: _Edward Riggs Monfort, Trustee_

Age: _44_

Social Security Number: _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_

(b)     Home Address: _36181 E. Lake Rd #441 Palm Harbor Fl_

Home Telephone Number: _727-434-0072_

(c)     Firm Name: _____

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

_____ Zip Code: _____

Business Telephone Number: _____

(d)     Send Correspondence to: Home ___✓___ Business_____

(e)     List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

ADOMANI, Inc. Subscription Agreement
5

(f)    List any business or professional education, indicating degrees received, if any: _____

_____ Bachelor Business Finance _____

_____ Western Carolina University _____

(g)    In which state do you currently

    (a)    Maintain your primary residence? ___Fl___

    (b)    Maintain your secondary residence? ___Fl___

    (c)    Vote? ___Fl___

    (d)    File income tax returns? ___Fl___

    (e)    Maintain a driver's license? ___Fl___

(h)    List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

    In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.    <u>Miscellaneous.</u>

    (a)    All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth in this Subscription Agreement hereof and to the undersigned at the address set forth on the signature page hereof.

    (b)    This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to conflict of law principles.

    (c)    This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

    (d)    The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

ADOMANI, Inc. Subscription Agreement

6

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you; and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he or she has read and understands the Executive Summary and this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _____6th_____ day of _August_ 20 _12_

_2,000,000_
Number of Shares Subscribed for

_Edward Monfort Trustee Of The_
_Monfort Revocable Living Trust_
NAME OF PURCHASER

at **$0.002** per Share

_N/A – Shares issued for_
$ _Patents for No Consideration_
Total Purchase Price

_____ Trustee
Signature

_Trustee_
Title of Authorized Signatory if Purchaser
is a corporation, partnership or other entity

_N/A_
Signature of Spouse or Co-Owner

⁎ For Patents after 2012
(89)

ADOMANI, Inc. Subscription Agreement
7

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.**

Accepted by Company,

**ADOMANI, Inc.**

By: _____

Title: _____ Chief Operations Executive Officer

Date: _____ 8/7/2012 _____

ADOMANI, Inc. Subscription Agreement
8

# EXHIBIT B

## SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares (the "Shares") of **ADOMANI, Inc.,** a Florida corporation, (the "Company") set forth on the signature page of this Subscription Agreement at a price of **$0.002** per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned is familiar with the business of the Company.

The undersigned agrees and represents as follows:

1.   <u>Representations, Warranties and Agreements.</u>

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)   That the undersigned is aware of the following:

(1)   The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to, those set forth in the Executive Summary;

(2)   The Company is newly formed and has been operating at a loss and may do so for the foreseeable future.

(3)   There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)   No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)   Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)   That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from

Company operations or otherwise will be made to Share Owners by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has talked to the Managers and is familiar with the Company's business model and intended operations, this Subscription Agreement, and all other documents in connection therewith. The undersigned confirms that all documents, records and books pertaining to the investment in the Company have been made available or offered to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information furnished by the Managers and that no written or oral representation or information that is in any way inconsistent with the statements of the Managers and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment, or is familiar with the Managers;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities, has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an

exemption therefrom.  In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is true, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the statements and information furnished from the Managers reflects the Company's current intentions and estimates at the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.     <u>Indemnification.</u>  The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, Share Owners, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.     <u>Entity Investors.</u>  If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity); (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the

investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment); and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.     Revocation.   The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for Shares for a period of 120 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.     Certain Securities Law Matters.

(a)     The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act.  The undersigned will cause any proposed purchaser, assignee, transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)     Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any Share split, dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

**THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.   SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.   COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.**

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)    The undersigned agrees to comply in all respects with the provisions of this Section 5. Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge. Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.    Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards. Therefore, certain information is requested below.

(a)    Name: _Edward Riggs Monfort_

Age: _44_

Social Security Number: _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_

(b)    Home Address: _36181 E. Lake Rd #41 Palm Harbor Fl_

Home Telephone Number: _727-434-007_

(c)    Firm Name: _____

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

_____ Zip Code: _____

Business Telephone Number: _____

(d)    Send Correspondence to:  Home _✓_  Business _____

(e)    List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

ADOMANI, Inc. Subscription Agreement
5

(f)     List any business or professional education, indicating degrees received, if any:  _____

_____ Bachelor Business Finance _____

_____ Western Carolina University _____

(g)     In which state do you currently

    (a)     Maintain your primary residence?  ___Fl_____

    (b)     Maintain your secondary residence?__Fl_____

    (c)     Vote?___Fl_____

    (d)     File income tax returns?____Fl_____

    (e)     Maintain a driver's license?__Fl_____

(h)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.     Miscellaneous.

    (a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth in this Subscription Agreement hereof and to the undersigned at the address set forth on the signature page hereof.

    (b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to conflict of law principles.

    (c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

    (d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

ADOMANI, Inc. Subscription Agreement
6

8.     Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you; and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change. The undersigned hereby certifies that he or she has read and understands the Executive Summary and this Subscription Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement this _7TH_ day of _AUG_ _2012_

_9,500 000_

Number of Shares Subscribed for

at $0.002 per Share

_PATENT VALUE_

$ _19 000.00_

Total Purchase Price

Edward Riggs Monfort

Trustee of the Monfort Irrevocable Trust 5-13-2009

NAME OF PURCHASER

Signature

Title of Authorized Signatory if Purchaser is a corporation, partnership or other entity

Signature of Spouse or Co-Owner

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.**

Accepted by Company,

**ADOMANI, Inc.**

By: _____

Title: ~~Chief Executive Officer~~  *COO*

Date: *8-7-12*

EXHIBIT C

# SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares (the "Shares") of **ADOMANI, Inc.,** a Florida corporation, (the "Company") set forth on the signature page of this Subscription Agreement at a price of **$0.002** per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws.  The undersigned further acknowledges and certifies that the undersigned is familiar with the business of the Company.

The undersigned agrees and represents as follows:

1. Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)     That the undersigned is aware of the following:

(1)     The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to, those set forth in the Executive Summary;

(2)     The Company is newly formed and has been operating at a loss and may do so for the foreseeable future.

(3)     There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)     No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)     Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)     That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from

Company operations or otherwise will be made to Share Owners by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has talked to the Managers and is familiar with the Company's business model and intended operations, this Subscription Agreement, and all other documents in connection therewith. The undersigned confirms that all documents, records and books pertaining to the investment in the Company have been made available or offered to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information furnished by the Managers and that no written or oral representation or information that is in any way inconsistent with the statements of the Managers and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment, or is familiar with the Managers;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities, has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an

exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is true, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the statements and information furnished from the Managers reflects the Company's current intentions and estimates at the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.     <u>Indemnification.</u>  The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, Share Owners, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.     <u>Entity Investors.</u>  If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity); (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the

investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment); and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4. <u>Revocation.</u>   The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for Shares for a period of 120 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5. <u>Certain Securities Law Matters.</u>

(a)     The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act. The undersigned will cause any proposed purchaser, assignee, transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)     Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any Share split, dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> **THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.   SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.   COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.**

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)    The undersigned agrees to comply in all respects with the provisions of this Section 5.  Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge.  Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.    Investor Information

The Company may only accept subscriptions from persons who meet certain suitability standards.  Therefore, certain information is requested below.

(a)    Name: _Edward Riggs Monfort_

Age: _44_

Social Security Number: _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_

(b)    Home Address: _36181 E. Lake Rd #141 Palm Harbor Fl_

Home Telephone Number: _727-4134007_

(c)    Firm Name: _____

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

_____ Zip Code: _____

Business Telephone Number: _____

(d)    Send Correspondence to:  Home _✓_  Business_____

(e)    List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

ADOMANI, Inc. Subscription Agreement
5

(f)     List any business or professional education, indicating degrees received, if any: _____

_____ Bachelor Business Finance _____

_____ Western Carolina University _____

(g)     In which state do you currently

(a)     Maintain your primary residence? _Fl_____

(b)     Maintain your secondary residence?_Fl_____

(c)     Vote?___Fl_____

(d)     File income tax returns?___Fl_____

(e)     Maintain a driver's license?_Fl_____

(h)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.     Miscellaneous.

(a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth in this Subscription Agreement hereof and to the undersigned at the address set forth on the signature page hereof.

(b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to conflict of law principles.

(c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you; and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change.  The undersigned hereby certifies that he or she has read and understands the Executive Summary and this Subscription Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement this ___7TH day of _Aug, 2012_.

Edward Riggs Monfort
Trustee of the Monfort Irrevocable Trust 5-13-2009

_9, 000, 000_

Number of Shares Subscribed for

NAME OF PURCHASER

at **$0.002** per Share

$ _18, 000. 00_

Total Purchase Price

Signature

Title of Authorized Signatory if Purchaser
is a corporation, partnership or other entity

Signature of Spouse or Co-Owner

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.**

Accepted by Company.

**ADOMANI, Inc.**

By: _____

Title: _____~~Chief Executive Officer~~ COO_____

Date: ___8-7-12___

EXHIBIT D

## SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares (the "Shares") of **ADOMANI, Inc.**, a Florida corporation, (the "Company") set forth on the signature page of this Subscription Agreement at a price of **$0.002** per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws. The undersigned further acknowledges and certifies that the undersigned is familiar with the business of the Company.

The undersigned agrees and represents as follows:

1.      Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)      That the undersigned is aware of the following:

(1)      The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to, those set forth in the Executive Summary;

(2)      The Company is newly formed and has been operating at a loss and may do so for the foreseeable future.

(3)      There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)      No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)      Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)      That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from

Company operations or otherwise will be made to Share Owners by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

(c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d)     That the undersigned has talked to the Managers and is familiar with the Company's business model and intended operations, this Subscription Agreement, and all other documents in connection therewith. The undersigned confirms that all documents, records and books pertaining to the investment in the Company have been made available or offered to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

(e)     That the undersigned has relied only on the information furnished by the Managers and that no written or oral representation or information that is in any way inconsistent with the statements of the Managers and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

(f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

(g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment, or is familiar with the Managers;

(h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities, has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

(i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

(j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an

exemption therefrom. In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)     That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)     That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)     That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is true, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)     That the undersigned acknowledges that the statements and information furnished from the Managers reflects the Company's current intentions and estimates at the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.     <u>Indemnification.</u>  The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, Share Owners, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.     <u>Entity Investors.</u>  If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity); (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the

investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment); and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4. <u>Revocation.</u>   The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for Shares for a period of 120 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5. <u>Certain Securities Law Matters.</u>

(a)   The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act.  The undersigned will cause any proposed purchaser, assignee, transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)   Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any Share split, dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

**THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.   SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.   COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.**

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

ADOMANI, Inc. Subscription Agreement
4

(c)     The undersigned agrees to comply in all respects with the provisions of this Section 5.  Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge.  Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.     <u>Investor Information</u>

The Company may only accept subscriptions from persons who meet certain suitability standards.  Therefore, certain information is requested below.

(a)     Name:  _Edward Riggs Moulfert_

Age:  _44_

Social Security Number:  _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_

(b)     Home Address:  _3681 E. Lake Rd #141 Palm Harbor Fl_

Home Telephone Number:  _727-434-007_

(c)     Firm Name:  _____

Nature of Business:  _____

Position/Title:  _____

Length of Time in Position:  _____

Business Address:  _____

_____

_____  Zip Code:  _____

Business Telephone Number:  _____

(d)     Send Correspondence to:  Home _✓_     Business_____

(e)     List each prior employment position or occupation during the last five years, giving dates:  _____

_____

_____

ADOMANI, Inc. Subscription Agreement
5

(f)     List any business or professional education, indicating degrees received, if any: _____

_____ Bachelor Business Finance _____

_____ Western Carolina University _____

(g)     In which state do you currently

    (a)     Maintain your primary residence?  Fl _____

    (b)     Maintain your secondary residence? Fl _____

    (c)     Vote?  Fl _____

    (d)     File income tax returns?   Fl _____

    (e)     Maintain a driver's license?  Fl _____

(h)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.     Miscellaneous.

    (a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth in this Subscription Agreement hereof and to the undersigned at the address set forth on the signature page hereof.

    (b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to conflict of law principles.

    (c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

    (d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

8.     Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you; and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change.  The undersigned hereby certifies that he or she has read and understands the Executive Summary and this Subscription Agreement.

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement this _2320_ day of _AUG,_ _2012_.

_10, 000, 000_

Number of Shares Subscribed for

at **$0.002** per Share

$ _20, 000.00_
Total Purchase Price

Edward Riggs Montfort
Trustee of the Montfort Irrevocable Trust 5-13-2009

NAME OF PURCHASER

_____
Signature

_____
Title of Authorized Signatory if Purchaser
is a corporation, partnership or other entity

_____
Signature of Spouse or Co-Owner

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.

Accepted by Company,

**ADOMANI, Inc.**

By: _____

Title: _____ Chief Executive Officer _ COO

Date: _____ 8-22-12

EXHIBIT E

## SUBSCRIPTION AGREEMENT

The undersigned hereby offers to subscribe for the number of shares (the "Shares") of **ADOMANI, Inc.,** a Florida corporation, (the "Company") set forth on the signature page of this Subscription Agreement at a price of **$0.002** per Share.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws.  The undersigned further acknowledges and certifies that the undersigned is familiar with the business of the Company.

The undersigned agrees and represents as follows:

1.      Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a)      That the undersigned is aware of the following:

(1)      The Shares are speculative investments which involve a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Shares, including, but not limited to, those set forth in the Executive Summary;

(2)      The Company is newly formed and has been operating at a loss and may do so for the foreseeable future.

(3)      There are significant restrictions on the transferability of the Shares; the Shares will not be, and the investors will have no rights to require that the Shares be registered under the Securities Act of 1933 (the "Act") or any state securities laws; there is no public market for the Shares and none is expected to develop; and, accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Company;

(4)      No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(5)      Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;

(b)      That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That the undersigned will or will not have to remain as owner of the Shares an exact or approximate length of time; (2) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (3) That any cash dividends from

Company operations or otherwise will be made to Share Owners by any specific date or will be made at all; or (4) That any specific tax benefits will accrue as a result of an investment in the Company;

        (c)     That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

        (d)     That the undersigned has talked to the Managers and is familiar with the Company's business model and intended operations, this Subscription Agreement, and all other documents in connection therewith.  The undersigned confirms that all documents, records and books pertaining to the investment in the Company have been made available or offered to the undersigned and/or to the undersigned's personal investment, tax and legal advisers, if such advisers were utilized by the undersigned;

        (e)     That the undersigned has relied only on the information furnished by the Managers and that no written or oral representation or information that is in any way inconsistent with the statements of the Managers and has been made or furnished to the undersigned or to the undersigned's purchaser representative in connection with the offering of the Shares, and if so made, has not been relied upon;

        (f)     That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

        (g)     That the undersigned is an "accredited investor" as that term is defined in Regulation D under the Act or is otherwise a sophisticated, knowledgeable investor (either alone or with the aid of a purchaser representative) with adequate net worth and income for this investment, or is familiar with the Managers;

        (h)     That the undersigned has knowledge and experience in financial and business matters (either alone or with the aid of a purchaser representative), is capable of evaluating the merits and risks of an investment in the Company and its proposed activities, has carefully considered the suitability of an investment in the Company for the undersigned's particular financial situation, and has determined that the Shares are a suitable investment;

        (i)     That the offer to sell Shares was communicated to the undersigned by the Company in such a manner that the undersigned was able to ask questions of and receive answers from the Company concerning the terms and conditions of this transaction and that at no time was the undersigned presented with or solicited by any leaflet, public promotional meeting, newspaper or magazine article, radio or television advertisement or any other form of advertising or general solicitation;

        (j)     That the Shares for which the undersigned hereby subscribes are being acquired solely for the undersigned's own account, for investment, and are not being purchased with a view to or for the resale, distribution, subdivision or fractionalization thereof; and the undersigned agrees that such Shares will not be sold without registration under the Act or an

exemption therefrom.   In furtherance thereof, the undersigned will not sell, hypothecate or otherwise transfer the undersigned's Shares unless the Shares are registered under the Act and qualified under applicable state securities laws or unless, in the opinion of the Company, an exemption from the registration requirements of the Act and such laws is available;

(k)      That the undersigned has had prior personal or business relationships with the Company or its affiliates, or by reason of the undersigned's business or financial experience (either alone or with the aid of a purchaser representative), the undersigned has the capacity to protect the undersigned's own interest in connection with this transaction;

(l)   ˋ   That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considers necessary;

(m)      That the undersigned certifies, under penalty of perjury, (i) that the social security or Tax Identification Number set forth herein is true, correct and complete, and (ii) that the undersigned is not subject to backup withholding either because the undersigned has not been notified that the undersigned is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the undersigned that the undersigned is no longer subject to backup withholding; and

(n)      That the undersigned acknowledges that the statements and information furnished from the Managers reflects the Company's current intentions and estimates at the current time, and as with any developing company, the precise elements of the Company's plans can be expected to change from time to time.

2.      **Indemnification.**  The undersigned shall indemnify, defend and hold harmless the Company, and any officers, employees, Share Owners, partners, agents, directors or controlling persons of the Company (collectively the "Indemnified Parties" and individually an "Indemnified Party") who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, against losses, liabilities and expenses of each Indemnified Party (including attorneys' fees, judgments, fines and amounts paid in settlement, payable as incurred) incurred by such person or entity in connection with such action, arbitration, suit or proceeding, by reason of or arising from (i) any misrepresentation or misstatement of facts or omission to represent or state facts made by the undersigned, including, without limitation, the information in this Subscription Agreement, or (ii) litigation or other proceeding brought by the undersigned against one or more Indemnified Party wherein the Indemnified Party is the prevailing party.

3.      **Entity Investors.**  If the undersigned is an entity, trust, pension fund or IRA account (an "Entity"), the Entity and the person signing on its behalf represent and warrant that: (i) such Entity is an existing entity, and has not been organized or reorganized for the purpose of making this investment (or if not true, such fact shall be disclosed to the Company in writing along with information concerning the beneficial owners of the Entity); (ii) the undersigned has the authority to execute this Subscription Agreement, and any other documents in connection with an investment in the Shares, on the Entity's behalf; (iii) the Entity has the power, right and authority to invest in the Shares and enter into the transactions contemplated thereby, and that the

investment is suitable and appropriate for the Entity and its beneficiaries (given the risks and illiquid nature of the investment); and (iv) all documents executed by the entity in connection with the Company are valid and binding documents or agreements of the Entity enforceable in accordance with their terms.

4.    <u>Revocation.</u>    The undersigned agrees that the undersigned may not cancel, terminate or revoke the offer to subscribe for Shares for a period of 120 days or any agreement hereunder at any time and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, beneficiaries, successors and assigns.

5.    <u>Certain Securities Law Matters.</u>

(a)    The Shares shall not be sold, assigned, transferred or pledged except upon satisfaction of the conditions specified in this Section 5, which conditions are intended to ensure compliance with the provisions of the Act.  The undersigned will cause any proposed purchaser, assignee, transferee or pledgee of the Shares held by the undersigned to agree to take and hold such securities subject to the provisions and conditions of this Section 5.

(b)    Each certificate representing (i) the Shares and (ii) any other securities issued in respect of the Shares upon any Share split, dividend, recapitalization, merger, consolidation or similar event, shall (unless otherwise permitted by the provisions of Section 5(c) below) be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

> **THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.  SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY ACCEPTABLE TO IT STATING THAT SUCH SALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.  COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SHARES AND RESTRICTING THEIR TRANSFER MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.**

The undersigned consents to the Company making a notation on its records and giving instructions to any transfer agent of the Shares in order to implement the restrictions on transfer established in this Section 5.

(c)    The undersigned agrees to comply in all respects with the provisions of this Section 5.  Prior to any proposed sale, assignment, transfer or pledge of any Shares, unless there is in effect a registration statement under the Act covering the proposed transfer, the undersigned thereof shall give written notice to the Company of the undersigned's intention to effect such transfer, sale, assignment or pledge.  Each such notice shall describe the manner and circumstances of the proposed transfer, sale, assignment or pledge in sufficient detail, and shall be accompanied, at the undersigned's expense evidence satisfactory to the Company the effect that the proposed transfer of the Shares may be affected without registration under the Act or applicable state securities law.

6.    <u>Investor Information</u>

The Company may only accept subscriptions from persons who meet certain suitability standards.  Therefore, certain information is requested below.

(a)    Name: _Edward Riggs Moufort_

Age: _44_

Social Security Number: _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_

(b)    Home Address: _36181 E. Lake Rd #441 Palm Harbor Fl_

Home Telephone Number: _727-434-007_

(c)    Firm Name: _____

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

_____ Zip Code: _____

Business Telephone Number: _____

(d)    Send Correspondence to: Home _✓_   Business _____

(e)    List each prior employment position or occupation during the last five years, giving dates: _____

_____

_____

(f)     List any business or professional education, indicating degrees received, if any: _____

_____Bachelor Business Finance_____

_____Western Carolina University_____

(g)     In which state do you currently

    (a)     Maintain your primary residence? __Fl____

    (b)     Maintain your secondary residence?_Fl____

    (c)     Vote?____Fl_____

    (d)     File income tax returns?____Fl_____

    (e)     Maintain a driver's license?__Fl_____

(h)     List any other information you believe is relevant in showing that you are able to adequately evaluate the risks and merits of this investment:

_____

_____

In furnishing the above information, I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a purchaser under applicable securities laws for the purposes of the proposed investment.

7.     <u>Miscellaneous.</u>

(a)     All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the Company at the address set forth in this Subscription Agreement hereof and to the undersigned at the address set forth on the signature page hereof.

(b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to conflict of law principles.

(c)     This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous understandings, representations, warranties or agreements (whether oral or written) and may be amended only by a writing executed by all parties.

(d)     The undersigned acknowledges that the Company may, in its sole and absolute discretion, accept or reject this subscription offer in whole or in part.

8.    Certification.

The undersigned represents to you that (i) the information contained herein is complete and accurate on the date hereof and may be relied upon by you; and (ii) the undersigned will notify you immediately of any change in any of such information occurring prior to the acceptance of the subscription and will promptly send you written confirmation of such change.  The undersigned hereby certifies that he or she has read and understands the Executive Summary and this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _11th_ day of _Sept, 2012_.

_7,500,000_

Number of Shares Subscribed for

at $0.002 per Share

Edward Riggs Monfort

Trustee of the Monfort Irrevocable Trust 5-13-2009

NAME OF PURCHASER

$ _15,000.00_

Total Purchase Price

_____

Signature

_____

Title of Authorized Signatory if Purchaser
is a corporation, partnership or other entity

_____

Signature of Spouse or Co-Owner

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.**

Accepted by Company,

**ADOMANI, Inc.**

By: _____

Title: _____ ~~Chief Executive Officer~~ _COO_

Date: __9 - 11 - 12_____

EXHIBIT F

**Incentive Stock Option Agreement Letter**
**ADOMANI, Inc.**

To: Edward Riggs Monfort

We are pleased to inform you that you have been selected
by the Board of Directors of ADOMANI, Inc., a Florida
corporation (the "Company"), to receive a stock option (the
"Option") for the purchase of Twelve Million shares
(12,000,000) (the "Option Shares") of the Company's Common
Stock at an exercise price of $0.10 per share. The terms of
the Option are set forth in this Agreement and in the
Company's 2012 Common Stock Option Plan (the "Plan"), a copy
of which is attached hereto and incorporated herein by
reference. This Agreement is limited by and subject to the
express terms and provisions of the Plan. Unless otherwise
provided in this Agreement, defined terms will have the
meaning given to such terms in the Plan.

1. **DATE OF GRANT:** The Option is granted effective as of
November 1, 2012.

2. **STATUS OF OPTION:** The Option is intended to be an
incentive stock option as described in Section 422 of the
Internal Revenue Code of 1986, as amended (the "Code"), but
the Company does not represent or warrant that the Option
qualifies as such.

3. **TERMS:** The term of the Option is eight (8) years from the
date of grant, unless sooner terminated as a result of
termination of your employment or services with the Company or
upon a terminating event (the "Terminating Event"), as
described in the Plan and Paragraph 12 of this Agreement.

4. **VESTING:** The Option shall vest according to the following
schedule:

1/60th from the Date of Grant

Any Option Shares that have not yet vested according to the
schedule set forth above shall be considered unvested shares
(the "Unvested Shares"). Upon cessation of your employment or
services on behalf of the Company for any reason, no further
vesting of the Option will occur and any unvested portion of
the Option with terminated.

4.1 **ACCELERATION OF VESTING:** In the event of a "transfer

1

of Control" the vesting schedule set forth above shall accelerate automatically for each remaining unvested installment of the Option. Such acceleration shall not be contingent upon any change in employment status, role, or responsibility level occurring in connection with such an event. For this purpose, a Transfer of Control shall be deemed to have occurred in the event of any of the following events with respect to the Company: (a) the direct or indirect sale or exchange by the stockholders of the Company of all or substantially all of the stock of the Company where the stockholders of the Company before such sale or exchange do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Company after such sale or exchange; (b) a merger in which the Company is not the surviving corporation; (c) a merger in which the Company is the surviving corporation where the stockholders of the Company before such merger do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Company after the merger; (d) the sale, exchange, or transfer of all or substantially all of the Company's assets; or (e) a liquidation or dissolution of the Company.

5.    **RIGHT TO EXERCISE:** The Option shall be immediately exercisable for any or all of the Option Shares, subject to your agreement that any unvested shares of stock purchased upon exercise are subject to the Company's repurchase rights set forth in Paragraph 6 below. Notwithstanding the foregoing, except as provided in Paragraph 15 below, the aggregate fair market value of the stock with respect to which you may exercise the Option for the first time during any calendar year, together with any other incentive stock options which are exercisable by you for the first time under any Company plan during any such year, as determined in accordance with Section 422 of the Code, shall not exceed Five Million Dollars ($5,000,000) (the "Exercise Limitation"). To the extent the exercisability of the Option is deferred by any reason of the $5,000,000 Exercise Limitation, the deferred portion of the Option will first become exercisable in the calendar year or years thereafter in which the $5,000,000 Exercise Limitation would not be contravened.

6.    **COMPANY REPURCHASE RIGHT:**

(a) By accepting the Option, you hereby grant to the Company an option (the "Repurchase Option") to repurchase any Option Shares that remain Unvested Shares on the earlier of (i) the

date you cease to be employed by or provide services to the Company (including a parent or subsidiary of the Company) for any reason whatsoever; including, without limitation, termination with or without cause, death or permanent disability; and (ii) the date you or your legal representative attempts to sell, exchange, transfer, pledge or otherwise dispose of any Unvested Shares (other than pursuant to a Terminating Event, as that term is defined in the Plan.

(b) The Company may exercise the Repurchase Option by giving you written notice within sixty (60) days after (i) such termination of employment or services (or exercise of the Option if later) or (ii) the Company has received notice of the attempted disposition. It the Company fails to give notice within such 60-day period, the repurchase Option shall terminate, unless you and the Company have extended the time for the exercise of the Repurchase Option. The Repurchase Option must me exercised, if at all, for all the Unvested Shares, except as you and the Company otherwise agree.

(c) Payment to you by the Company shall; be made in cash within thirty (30) days after the date of the mailing of the written notice of exercise of the Repurchase Option. For purposes of the foregoing, cancellation of any indebtedness you owe to the Company shall be treated as payment to you in cash to the extent of the unpaid principal and any accrued interest canceled. The purchase price per share being repurchased by the Company shall be an amount equal to your original cost per share, as adjusted as provided in the Plan. You shall deliver the shares of stock being repurchased to the Company at the same time as the Company delivers the purchase price to you.

(d) You hereby authorize and direct the Company's Chief Financial Officer or transfer agent to transfer to the Company any Unvested Shares as to which the Repurchase Option is exercised.

(e) The Company shall have the right to assign the Repurchase Option at any time, whether or not the Repurchase Option is then exercisable, to one or more personas as may be selected by the Company.

(f) The Repurchase Option shall remain in full force and effect in the event of a Terminating Event, provided that if the Administrative Committee determines that an assumption or substitution of options outstanding under the Plan will not be

3

made in connection with the Terminating event and the vesting
of such options is therefore accelerated pursuant to the Plan,
the Repurchase Option shall terminate and all Unvested Shares
shall immediately vest in full.

(g) Nothing in this Agreement shall affect in any manner
whatsoever the right or power of the Company, or a parent or a
subsidiary of the Company, to terminate your employment or
services on behalf of the Company, for any reason, with or
without cause.

(h) Subject to the terms and conditions of this Agreement, the
Invested Shares may not be sold, transferred, pledged,
encumbered or disposed of under any circumstances, whether
voluntarily, by operation of law, by gift or by the applicable
laws of descent and distribution. Any attempted transfer of
any Unvested Shares in conflict with this Agreement shall be
null and void.

7.   **MARKET STANDOFF**: By accepting the Option, you hereby
agree that, in connection with any underwritten public
offering by the Company of its equity securities pursuant to
an effective registration statement filed under the Federal
Securities At of 1933, as amended (the "Securities Act"),
including the Company's initial public offering, you shall not
sell or make any short sale of, loan, hypothecate, pledge,
grant any option for the purchase of, or otherwise dispose of
or transfer for value or otherwise agree to engage in any of
the foregoing transaction with respect to, any Option Shares
without the prior written consent of the Company or its
underwriters. Such limitations (the "Market Standoff") shall
be in effect only if and to the extent and for such period of
times as may be required by the Company or such underwriters
and agreed to by the Company's officers and directors;
provided, however, that in no event shall the weighted average
number of days in such period exceed 180 days. The Market
Standoff shall in all events terminate two years after the
effective date of the Company's initial public offering. In
order to enforce the Market Standoff, the Company may impose
stop-transfer instructions with respect to the Option Shares
until the end of the applicable Market Standoff period.

8.   **SHAREHOLDERS AGREEMENT**: By accepting the Option you
hereby agree to execute, on the date you exercise the Option,
a shareholders agreement (the "Shareholders Agreement"), if
any, in the form in use at such time (unless at such time the
Company's stock is publicly traded or the Shareholders

4

Agreement has otherwise terminated), whereby under certain circumstances you grant the Company and certain of its other shareholders a right of first offer to purchase the Option shares and agree not to dispose of the Option Shares until after December 31, 2014 without the Company's prior written consent.

9.   **CAPITAL ADJUSTMENTS:** In the event of any stock dividend, stock split, stock issuance by the Board of Directors to all outstanding shareholders, or consolidation of shares of any capital adjustment of any of the outstanding securities of the Company, any and all new, substituted or additional securities or other property to which you are entitled be reason of ownership of the Options Shares shall be immediately subject to this Agreement and shall be included in the definition of the Option Shares for all purposes and shall be subject to the Repurchase Option, the Shareholders Agreement, and the Market Standoff and other terms of this Agreement. While the aggregate repurchase price for Unvested Shares shall remain the same after each event, the repurchase price per Unvested Share upon execution of the Repurchase Option shall be appropriately adjusted.

10.   **METHOD OF EXERCISE:** The Option may be exercised by written notice to the Company, in the form and substance satisfactory to the Company, which must state the election to exercise the Option, the number of shares of stock for which the Option is being exercised and such other representations and agreements as to your investment intent with respect to such shares as may be required pursuant to the provisions of this Agreement and the Plan. The written notice must be accompanied by full payment of the exercise price for the number of shares of stock being purchased.

11.   **FORM OF PAYMENT:** The Option exercise price may be paid, in whole or in part, in cash, by check, or by cash equivalent, or in any other form of payment permitted by the Plan Administrator.

12.   **EARLY TERINATION:** The Option will terminate in its entirety three months after cessation of employment or services on behalf of the Company or its affiliated companies, unless cessations is due to (a) disability, in which case the Option shall terminate one year after cessation of employment or services on behalf of the Company, or (b) death, in which case the Option shall terminate one year after death.

5

13.  **LIMITED TRANSFERABILITY:** The Option is not transferable
except by will or by the applicable laws of descent and
distribution. During your lifetime only you can exercise the
Option. The Plan provides for exercise of the Option by the
personal representative of your estate or he beneficiary
thereof following your death.

14.  **NOTICE OF DISQUALIFYING DISPOSITION:** To obtain certain
tax benefits afforded to incentive stock options under Section
422 of the Code, an optionee must hold the shares issued upon
the exercise of the incentive stock option for two years after
the date of grant and one year from the date of exercise. An
optionee may be subject to the alternative minimum tax at the
time of exercise. Tax advice should ne obtained when
exercising any option and prior to the disposition of the
shares issued upon the exercise of any option. By accepting
the Option, you hereby agree to promptly notify the Company's
Chief Financial Officer if you dispose of any of the Option
Shares within one year from the date you exercise all or part
of the Option or within two years of the date of grant of the
Option.

15.  **EXCEPTION TO $5,000,000 EXERCISE LIMITATION:**
Notwithstanding any other provision of this Agreement, if
compliance with the above $5,000,000 Exercise Limitation as
set forth above in Paragraph 5 above will result in the
exercisability of any vested shares being delayed more than 30
days beyond the vesting date for such shares, the Option shall
be deemed to be two options. The first Option shall be for the
maximum number of shares subject to the Option that can comply
with the $5,000,000 Exercise Limitation without causing the
Option to be unexercisable as to vested shares. The second
Option, which shall not be treated as an incentive stock
option, shall be for the balance of the shares subject to the
Option and shall be exercisable on the same terms and
conditions and at the same time as set fort in this Agreement;
provided, however, that the second sentence of Paragraph 4
above shall not apply to the second option and such shares
shall become vested shares on the same date or dates as set
forth in this agreement without regard to this paragraph.
Unless you specifically elect to the contrary in your written
notice of exercise, the first option shall be deemed to be
exercised first to the maximum possible extent and then the
second option shall be deemed exercised.

16.  **REGISTRATION: YOUR PARTICULAR ATTENTION IS DIRECTED TO
THE PLAN WHICH DESCRIBES CERTAIN IMPORTANT CONDITIONS RELATING**

6

**TO FEDERAL AND STATE SECURITIES LAWS THAT MUST BE SATISFIED BEFORE THE OPTION CAN BE EXERCISED AND BEFORE THE COMPANY CAN ISSUE SHARES TO YOU.** By accepting the Option, you hereby acknowledge that you have read the Plan and that you are hereby making the representations and acknowledgments to the Company, and entering into the indemnity and other obligations to the Company, therein specified.

17.  **BINDING EFFECT:** This Agreement shall inure to the benefit of the successors and assigns of the Company and be binding upon you and your heirs, executors, administrators, successors, and assigns.

Please execute the following Acceptance and Acknowledgment and return to the undersigned.

Sincerely,

Dennis R. Di Ricco
Executive Director


### ACCEPTANCE AND ACKNOWLEDGMENT

I, Edward Riggs Monfort, a resident of the State of Florida, accept the incentive stock option described in this agreement and in ADOMANI. Inc.'s 2012 Common Stock Option Plan, and acknowledges receipt of a copy of this Agreement and a copy of the Plan. I have read and understand the Plan, and I hereby make the representations, warranties and acknowledgments, and undertake the indemnity and other obligations, therein specified. As a condition to my exercise of this stock option, I agree to execute the Company's Shareholders Agreement and Stock Purchase Agreement in effect at such time.

Dated:  _11/01_  , 20_12_

_____                    _____
Edward Riggs Monfort                     Taxpayer Identification

By his or her signature below, the spouse of the Optionee, if such Optionee is legally married as of the date of his or her

7

execution of this Agreement, acknowledges that he or she has read this agreement, acknowledges that he or she is familiar with the terms and provisions thereof, and agrees to be bound by al the terms and conditions of this Agreement and the Plan.

Date: _____, 20____


_____
Spouse


_____
Printed Name

# EXHIBIT G

**Incentive Stock Option Agreement Letter
ADOMANI, Inc.**

To: Edward Riggs Monfort

We are pleased to inform you that you have been selected by the Board of Directors of ADOMANI, Inc., a Florida corporation (the "Company"), to receive a stock option (the "Option") for the purchase of Three Million shares (3,000,000) (the "Option Shares") of the Company's Preferred Stock at an exercise price of $0.10 per share. The terms of the Option are set forth in this Agreement and in the Company's 2012 Preferred Stock Option Plan (the "Plan"), a copy of which is attached hereto and incorporated herein by reference. This Agreement is limited by and subject to the express terms and provisions of the Plan. Unless otherwise provided in this Agreement, defined terms will have the meaning given to such terms in the Plan.

1.   **DATE OF GRANT:** The Option is granted effective as of June 1, 2014.

2.   **STATUS OF OPTION:** The Option is intended to be an incentive stock option as described in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), but the Company does not represent or warrant that the Option qualifies as such.

3.   **TERMS:** The term of the Option is eight (8) years from the date of grant, unless sooner terminated as a result of termination of your employment or services with the Company or upon a terminating event (the "Terminating Event"), as described in the Plan and Paragraph 12 of this Agreement.

4.   **VESTING:** The Option shall vest according to the following schedule:

1/60th from the Date of Grant

Any Option Shares that have not yet vested according to the schedule set forth above shall be considered unvested shares (the "Unvested Shares"). Upon cessation of your employment or services on behalf of the Company for any reason, no further vesting of the Option will occur and any unvested portion of the Option with terminated.

4.1   **ACCELERATION OF VESTING:** In the event of a "transfer

1

of Control" the vesting schedule set forth above shall accelerate automatically for each remaining unvested installment of the Option. Such acceleration shall not be contingent upon any change in employment status, role, or responsibility level occurring in connection with such an event. For this purpose, a Transfer of Control shall be deemed to have occurred in the event of any of the following events with respect to the Company: (a) the direct or indirect sale or exchange by the stockholders of the Company of all or substantially all of the stock of the Company where the stockholders of the Company before such sale or exchange do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Company after such sale or exchange; (b) a merger in which the Company is not the surviving corporation; (c) a merger in which the Company is the surviving corporation where the stockholders of the Company before such merger do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Company after the merger; (d) the sale, exchange, or transfer of all or substantially all of the Company's assets; or (e) a liquidation or dissolution of the Company.

5. **RIGHT TO EXERCISE:** The Option shall be immediately exercisable for any or all of the Option Shares, subject to your agreement that any unvested shares of stock purchased upon exercise are subject to the Company's repurchase rights set forth in Paragraph 6 below. Notwithstanding the foregoing, except as provided in Paragraph 15 below, the aggregate fair market value of the stock with respect to which you may exercise the Option for the first time during any calendar year, together with any other incentive stock options which are exercisable by you for the first time under any Company plan during any such year, as determined in accordance with Section 422 of the Code, shall not exceed Five Million Dollars ($5,000,000) (the "Exercise Limitation"). To the extent the exercisability of the Option is deferred by any reason of the $5,000,000 Exercise Limitation, the deferred portion of the Option will first become exercisable in the calendar year or years thereafter in which the $5,000,000 Exercise Limitation would not be contravened.

6. **COMPANY REPURCHASE RIGHT:**

(a) By accepting the Option, you hereby grant to the Company an option (the "Repurchase Option") to repurchase any Option Shares that remain Unvested Shares on the earlier of (i) the

2

date you cease to be employed by or provide services to the
Company (including a parent or subsidiary of the Company) for
any reason whatsoever; including, without limitation,
termination with or without cause, death or permanent
disability; and (ii) the date you or your legal representative
attempts to sell, exchange, transfer, pledge or otherwise
dispose of any Unvested Shares (other than pursuant to a
Terminating Event, as that term is defined in the Plan.

(b) The Company may exercise the Repurchase Option by giving
you written notice within sixty (60) days after (i) such
termination of employment or services (or exercise of the
Option if later) or (ii) the Company has received notice of
the attempted disposition. It the Company fails to give notice
within such 60-day period, the repurchase Option shall
terminate, unless you and the Company have extended the time
for the exercise of the Repurchase Option. The Repurchase
Option must me exercised, if at all, for all the Unvested
Shares, except as you and the Company otherwise agree.

(c) Payment to you by the Company shall; be made in cash
within thirty (30) days after the date of the mailing of the
written notice of exercise of the Repurchase Option. For
purposes of the foregoing, cancellation of any indebtedness
you owe to the Company shall be treated as payment to you in
cash to the extent of the unpaid principal and any accrued
interest canceled. The purchase price per share being
repurchased by the Company shall be an amount equal to your
original cost per share, as adjusted as provided in the Plan.
You shall deliver the shares of stock being repurchased to the
Company at the same time as the Company delivers the purchase
price to you.

(d) You hereby authorize and direct the Company's Chief
Financial Officer or transfer agent to transfer to the Company
any Unvested Shares as to which the Repurchase Option is
exercised.

(e) The Company shall have the right to assign the Repurchase
Option at any time, whether or not the Repurchase Option is
then exercisable, to one or more personas as may be selected
by the Company.

(f) The Repurchase Option shall remain in full force and
effect in the event of a Terminating Event, provided that if
the Administrative Committee determines that an assumption or
substitution of options outstanding under the Plan will not be

3

made in connection with the Terminating event and the vesting of such options is therefore accelerated pursuant to the Plan, the Repurchase Option shall terminate and all Unvested Shares shall immediately vest in full.

(g) Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or a subsidiary of the Company, to terminate your employment or services on behalf of the Company, for any reason, with or without cause.

(h) Subject to the terms and conditions of this Agreement, the Invested Shares may not be sold, transferred, pledged, encumbered or disposed of under any circumstances, whether voluntarily, by operation of law, by gift or by the applicable laws of descent and distribution. Any attempted transfer of any Unvested Shares in conflict with this Agreement shall be null and void.

7.   **MARKET STANDOFF:** By accepting the Option, you hereby agree that, in connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Federal Securities At of 1933, as amended (the "Securities Act"), including the Company's initial public offering, you shall not sell or make any short sale of, loan, hypothecate, pledge, grant any option for the purchase of, or otherwise dispose of or transfer for value or otherwise agree to engage in any of the foregoing transaction with respect to, any Option Shares without the prior written consent of the Company or its underwriters. Such limitations (the "Market Standoff") shall be in effect only if and to the extent and for such period of times as may be required by the Company or such underwriters and agreed to by the Company's officers and directors; provided, however, that in no event shall the weighted average number of days in such period exceed 180 days. The Market Standoff shall in all events terminate two years after the effective date of the Company's initial public offering. In order to enforce the Market Standoff, the Company may impose stop-transfer instructions with respect to the Option Shares until the end of the applicable Market Standoff period.

8.   **SHAREHOLDERS AGREEMENT:** By accepting the Option you hereby agree to execute, on the date you exercise the Option, a shareholders agreement (the "Shareholders Agreement"), if any, in the form in use at such time (unless at such time the Company's stock is publicly traded or the Shareholders

4

Agreement has otherwise terminated), whereby under certain
circumstances you grant the Company and certain of its other
shareholders a right of first offer to purchase the Option
shares and agree not to dispose of the Option Shares until
after May 31, 2016 without the Company's prior written
consent.

9.   **CAPITAL ADJUSTMENTS:** In the event of any stock dividend,
stock split, stock issuance by the Board of Directors to all
outstanding shareholders, or consolidation of shares of any
capital adjustment of any of the outstanding securities of the
Company, any and all new, substituted or additional securities
or other property to which you are entitled be reason of
ownership of the Options Shares shall be immediately subject
to this Agreement and shall be included in the definition of
the Option Shares for all purposes and shall be subject to the
Repurchase Option, the Shareholders Agreement, and the Market
Standoff and other terms of this Agreement. While the
aggregate repurchase price for Unvested Shares shall remain
the same after each event, the repurchase price per Unvested
Share upon execution of the Repurchase Option shall be
appropriately adjusted.

10.  **METHOD OF EXERCISE:** The Option may be exercised by
written notice to the Company, in the form and substance
satisfactory to the Company, which must state the election to
exercise the Option, the number of shares of stock for which
the Option is being exercised and such other representations
and agreements as to your investment intent with respect to
such shares as may be required pursuant to the provisions of
this Agreement and the Plan. The written notice must be
accompanied by full payment of the exercise price for the
number of shares of stock being purchased.

11.  **FORM OF PAYMENT:** The Option exercise price may be paid,
in whole or in part, in cash, by check, or by cash equivalent,
or in any other form of payment permitted by the Plan
Administrator.

12.  **EARLY TERINATION:** The Option will terminate in its
entirety three months after cessation of employment or
services on behalf of the Company or its affiliated companies,
unless cessations is due to (a) disability, in which case the
Option shall terminate one year after cessation of employment
or services on behalf of the Company, or (b) death, in which
case the Option shall terminate one year after death.

13.  **LIMITED TRANSFERABILITY:** The Option is not transferable except by will or by the applicable laws of descent and distribution. During your lifetime only you can exercise the Option. The Plan provides for exercise of the Option by the personal representative of your estate or he beneficiary thereof following your death.

14.  **NOTICE OF DISQUALIFYING DISPOSITION:** To obtain certain tax benefits afforded to incentive stock options under Section 422 of the Code, an optionee must hold the shares issued upon the exercise of the incentive stock option for two years after the date of grant and one year from the date of exercise. An optionee may be subject to the alternative minimum tax at the time of exercise. Tax advice should ne obtained when exercising any option and prior to the disposition of the shares issued upon the exercise of any option. By accepting the Option, you hereby agree to promptly notify the Company's Chief Financial Officer if you dispose of any of the Option Shares within one year from the date you exercise all or part of the Option or within two years of the date of grant of the Option.

15.  **EXCEPTION TO $5,000,000 EXERCISE LIMITATION:** Notwithstanding any other provision of this Agreement, if compliance with the above $5,000,000 Exercise Limitation as set forth above in Paragraph 5 above will result in the exercisability of any vested shares being delayed more than 30 days beyond the vesting date for such shares, the Option shall be deemed to be two options. The first Option shall be for the maximum number of shares subject to the Option that can comply with the $5,000,000 Exercise Limitation without causing the Option to be unexercisable as to vested shares. The second Option, which shall not be treated as an incentive stock option, shall be for the balance of the shares subject to the Option and shall be exercisable on the same terms and conditions and at the same time as set fort in this Agreement; provided, however, that the second sentence of Paragraph 4 above shall not apply to the second option and such shares shall become vested shares on the same date or dates as set forth in this agreement without regard to this paragraph. Unless you specifically elect to the contrary in your written notice of exercise, the first option shall be deemed to be exercised first to the maximum possible extent and then the second option shall be deemed exercised.

16.  **REGISTRATION: YOUR PARTICULAR ATTENTION IS DIRECTED TO THE PLAN WHICH DESCRIBES CERTAIN IMPORTANT CONDITIONS RELATING**

**TO FEDERAL AND STATE SECURITIES LAWS THAT MUST BE SATISFIED BEFORE THE OPTION CAN BE EXERCISED AND BEFORE THE COMPANY CAN ISSUE SHARES TO YOU.** By accepting the Option, you hereby acknowledge that you have read the Plan and that you are hereby making the representations and acknowledgments to the Company, and entering into the indemnity and other obligations to the Company, therein specified.

17. **BINDING EFFECT:** This Agreement shall inure to the benefit of the successors and assigns of the Company and be binding upon you and your heirs, executors, administrators, successors, and assigns.

Please execute the following Acceptance and Acknowledgment and return to the undersigned.

Sincerely,

Dennis R. Di Ricco
Executive Director


### ACCEPTANCE AND ACKNOWLEDGMENT

I, Edward Riggs Monfort, a resident of the State of Florida, accept the incentive stock option described in this agreement and in ADOMANI. Inc.'s 2012 Preferred Stock Option Plan, and acknowledges receipt of a copy of this Agreement and a copy of the Plan. I have read and understand the Plan, and I hereby make the representations, warranties and acknowledgments, and undertake the indemnity and other obligations, therein specified. As a condition to my exercise of this stock option, I agree to execute the Company's Shareholders Agreement and Stock Purchase Agreement in effect at such time.

Dated:  01 / 01 , 20 14

_____          _____
Edward Riggs Monfort             Taxpayer Identification

By his or her signature below, the spouse of the Optionee, if such Optionee is legally married as of the date of his or her

7

execution of this Agreement, acknowledges that he or she has read this agreement, acknowledges that he or she is familiar with the terms and provisions thereof, and agrees to be bound by al the terms and conditions of this Agreement and the Plan.

Date: _____, 20____


_____
Spouse


_____
Printed Name

# EXHIBIT H



June 5, 2016

Mr. Edward Montfort

Dear Edward:

On behalf of **ADOMANI, Inc.** (the "**Company**"), I am pleased to confirm your continuing employment with the Company on the following terms. You are referred to hereafter as "Executive."

       1.    **Position and Duties.**  Executive's title will be Chief Technology Officer (the "CTO"), and Executive will report to the Company's Chief Executive Officer (the "CEO") and the term will be for two years.  In this position, Executive's duties will consist of ID projects to be worked on, segregating between R & D vs. production, and recommending them. Executive will also respond to projects suggested by other Company Executives, obtain CEO approval of the projects in general before proceeding to creating a budget. Without CEO approval, no project should proceed in any manner. Executive will create budgets, including outside resources and travel, timeline for completion for projects approved by the CEO including where the projects will be worked on. Executive will conduct all background checks on all contractors and ADOMANI employees to be hired or retained for each project, and submit, along with resumes, with the project budget, to the CEO for approval before incurring any project costs. Executive will also supervise all resources and furnish the CEO or a designee all weekly status reports. Should an approved project's actual cost for parts, labor, travel, and/or other expenses exceed 5% of the budgeted cost, Executive will immediately notify the CEO and CFO and receive in writing any approval for additional spending on the project. In this position, Executive's duties shall consist of providing technological assistance to the Company in its business of zero-emission electric and hybrid vehicle solutions to school bus and medium to heavy-duty fleet operators. Executive shall not engage in additional technology development without first obtaining CEO approval of the projects in general before proceeding. Executive will also supervise outside vendors who provide technological support for the business of the Company. In addition, Executive will advise the CEO or CFO of any activity on projects that require additional or special insurance or other costs to be provided and will comply with all Company policies on invoice approval and timely submit invoices for payment, including the utilization of the Company Purchase Order System and Procedures.  In performing Executive's duties, Executive shall devote his full business time and best efforts on behalf of Company, and shall abide by all Company policies and directives, as well as all applicable laws.  Further, during Executive's employment with Company, Executive agrees not to engage in any work, paid or unpaid, or other activities that create a conflict of interest, or disrupt or interfere with Company's operations; however, nothing contained herein shall prevent Executive from engaging in other technological development for his own account or for others so long as such outside research/development is outside the scope of Company's business.

       2.    **Base Salary.**  The Company will pay Executive a base salary at the rate of $10,000.00 per month (which annualizes to $120,000.00 per year) starting June 1, 2016, payable in accordance with the Company's standard payroll schedule.  This salary will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time.

3.     **Employee Benefits**.  Executive will remain eligible to participate in various Company fringe benefit plans offered by Company to full-time employees as of the date of this letter, subject to the terms and conditions of such benefit plans.  The Company may change its benefit plans, from time to time, at its discretion.  Executive has been granted stock options by grant letters as to 12,000,000 shares of common stock and 3,000,000 shares of preferred stock effective November 1, 2012 and June 1, 2014, respectively, which vest at the rate of $1/60^{th}$ per month from the date of grant. Said option grant has been amended by amendment of even date herewith.

4.     **Other Consideration.**  In consideration for Executive's execution of a general release in the form attached hereto as Exhibit A, the Company will pay Executive the sum of $200,000.00 to ELO, LLC.  Company agrees to pay for two years, commencing June 1, 2016 through May 31, 2018, $3,000.00 per month for the services of a contracted consultant to be selected by Executive.  In addition, Company agrees to pay to ELO, LLC for two years, commencing June 1, 2016 through May 31, 2018, up to $7,000.00 per month for invoiced expenses.

5.     **Employment Relationship**.   This Agreement contemplates a two-year employment period, beginning on June 1, 2016 and ending on May 31, 2018. Executive may terminate Executive's employment at any time and for any reason.  Any contrary representations that may have been made to Executive are superseded by this letter agreement.  This is the full and complete agreement between Executive and the Company on this term.

6.     **Termination of Employment**.

(a)     **Resignation.**  If Executive voluntarily terminates his employment with the Company at any time for any reason, Executive will be entitled to Executive's base salary then in effect prorated through Executive's termination date, as well as any accrued but unused vacation, and Executive shall not be entitled to any other compensation or benefits from Company other than vested stock option rights.

(b)     **Termination for Cause, Death or Disability.**  If the Company terminates Executive's employment for Cause (as defined in Paragraph 7 below, and as determined in the discretion of the Board) or if Executive's employment with Company terminates as a result of Executive's death or Disability, Executive will be entitled to his base salary then in effect prorated through his termination date, in addition to any accrued but unused vacation, and Executive shall not be entitled to any other compensation or benefits from Company, other than stock option rights.

7.     **Definitions**.  The following terms have the meaning set forth below wherever they are used in this letter agreement:

"**Cause**" means the occurrence of any of the following:

(i)     Executive's gross negligence, willful misconduct or his failure to substantially perform Executive's duties and responsibilities to the reasonable satisfaction of the Board; his material breach of his fiduciary duties to the Company; or his breach of a material term of the Employee Proprietary Information and Inventions Assignment Agreement.  Any act

June 6, 2016
Page 3

or acts or omission or omissions by Executive that have an adverse effect on the Company's operations, prospects, reputation or business shall be deemed to be such a breach of Executive's duties and responsibilities to the Company.

(ii)     Executive's conviction for a felony; in which case, notwithstanding anything set forth in this letter agreement, the Company may immediately terminate Executive's employment for Cause.

(iii)     Executive's engagement in acts of fraud, embezzlement, or dishonesty; in which case, notwithstanding anything set forth in this letter agreement, the Company may immediately terminate Executive's employment for Cause.

"**Disability**" means "disability" within the meaning of Section 22(e)(3) of the Internal Revenue Code of 1986, as amended.

8.     **Tax Matters**.

a.     **Withholding**.   All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

(b)     **Tax Advice**.   Executive is encouraged to obtain his own tax advice regarding his compensation from the Company.   Executive agrees that the Company does not have a duty to design its compensation policies in a manner that minimizes his tax liabilities, and Executive will not make any claim against the Company or the Board related to tax liabilities arising from his compensation.

9.     **Interpretation and Disputes**.   This letter agreement supersedes and replaces any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between Executive and the Company and constitute the complete agreement between Executive and the Company regarding the subject matter set forth herein.   This letter agreement may not be amended or modified, except by an express written agreement signed by both Executive and a duly authorized officer of the Company.   The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, Executive's employment with the Company or any other relationship between Executive and the Company (the "**Disputes**") will be governed by California law, excluding laws relating to conflicts or choice of law.   Executive and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in Santa Clara County in connection with any Dispute or any claim related to any Dispute.

10.     **Confidential Information, Rights and Duties**.   Executive shall be required as a condition of employment to sign and abide by the Employee Proprietary Information and Inventions Agreement (the "Inventions Agreement"), which is attached hereto as Exhibit B and which is incorporated herein by this reference.   The Inventions Agreement may be revised and amended from time to time by the Company and Executive and shall survive termination of Executive's employment with the Company.   To the extent any of the provisions of the Inventions Agreement provide broader protections to the Company than those set forth in this Agreement, the Inventions Agreement shall control.

June 6, 2016
Page 4

11.     **Older Workers' Benefit Protection Act**.  This  release is intended to satisfy the requirements of the Older Workers' Benefit Protection Act, 29 U.S.C. sec. 626(f).  Employee is advised to consult with an attorney before executing this release.

a.     **Acknowledgments**.     Executive acknowledges and agrees that (a) Executive has read and understands the terms of this Agreement; (b) Executive has been advised in writing to consult with an attorney before executing this Agreement; (c) Executive has obtained and considered such legal counsel as Executive deems necessary; (d) Executive has been given sufficient time to enter into this Employment Agreement; and (e) by signing this Agreement, Executive acknowledges that Executive does so freely, knowingly, and voluntarily.

b.     **Effective Date**.  This Agreement shall become effective and enforceable upon Executive and Company signing this Agreement.

12.     **Preserved Rights of Executive**.  This Agreement does not waive or release any rights or claims that Executive may have under the Age Discrimination in Employment Act that arise after the execution of this Agreement.  In addition, this Agreement does not prohibit Executive from challenging the validity of this Agreement's waiver and release of claims under the Age Discrimination in Employment Act of 1967, as amended. Company shall, to the maximum extent permitted by law, defend, indemnify and hold Executive harmless from costs, expenses, damages and other liability incurred by Executive for any acts or decisions made in good faith while performing services for Company.

Executive may indicate his agreement with these terms and accept this offer by signing and dating the enclosed duplicate original of this letter agreement and returning it to the Company.

Very truly yours,

By: _____

Title: _____

I have read and accept this employment offer:

_____
Edward Monfort

Dated: ___6-23-16___

## ATTACHMENT A

## RELEASE OF CLAIMS

In consideration for receiving the benefits described herein, conditioned upon the initial public offering of shares of the Company being successfully completed, Executive hereby generally releases and forever discharges the Company, its parent, subsidiary, affiliated and related entities, and its and their respective officers, directors, employees, shareholders, contractors, consultants, agents, attorneys, predecessors, affiliates and assigns (collectively, the "Released Parties"), from any and all claims, liabilities, demands, causes of action, attorneys' fees, damages, or obligations of every kind and nature, whether known or unknown, arising at any time prior to the date Executive signs this Employment Agreement. This general release of claims includes (but is not limited to) all claims arising from or relating to all federal and state statutory and common law claims, claims related to Executive's employment or other relationships with the Released Parties, or claims related to breach of contract, tort, wrongful termination, discrimination, wages or benefits, or claims for any form of compensation, benefits, equity or other ownership, and any other forms of remuneration including claims to attorneys' fees or costs, claims of wrongful discharge, constructive discharge, emotional distress, defamation, invasion of privacy, fraud, breach of contract, breach of the covenant of good faith and fair dealing, any claims of discrimination or harassment based on sex, age, race, national origin, disability or on any other basis, under Title VII of the Civil Rights Act of 1964, as amended, the California Fair Employment and Housing Act, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act, and all other laws and regulations relating to employment. Notwithstanding the foregoing, Executive is not releasing any rights he or she has under this Agreement or any claims which cannot be released as a matter of law.

Executive acknowledges and represents that, with the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to Executive.

Executive expressly waives and releases any and all rights and benefits under Section 1542 of the *Civil Code of the State of California* (or any analogous law of any other state), which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which, if known by him or her, must have materially affected his or her settlement with the debtor."**

Executive and the Company do not intend to release claims that Executive may not release as a matter of law, including but not limited to claims for indemnity under California Labor Code Section 2802 or other applicable law. Nothing in this release waives Executive's rights to indemnification or any payments under any fiduciary insurance policy, if any, provided by any act or agreement of the Company, or pursuant to state or federal law or policy of insurance.

EXHIBIT I

# ADOMANI, Inc.

## SUBSCRIPTION AGREEMENT

This **SUBSCRIPTION AGREEMENT** (this "**Subscription Agreement**") by and between ADOMANI, Inc., a Florida corporation (the "**Company**"), and the undersigned individual or corporation, partnership, limited liability company, trust or other qualified entity executing this Subscription Agreement as an investor (the "**Investor**") is effective as of the date set forth on the signature page attached hereto as accepted by the Company (the "**Effective Date**"), recites and provides as follows:

## RECITALS

A.      The Company wishes to issue to the Investor, and the Investor wishes to acquire from the Company, Common Stock of the Company (the "**Shares**") having the rights, terms and preferences described in this Subscription Agreement and the Articles of Incorporation (as defined below). Hereinafter, the Shares and any equity securities representing ownership in the Company or a successor entity into which the Shares may be converted or exchanged directly or indirectly are sometimes collectively referred to as the "**Securities**."

B.      The Investor has been furnished with, and hereby acknowledges its receipt and review of the Articles of Incorporation of the Company dated as of August 6, 2012 (the "**Articles of Incorporation**") and the Bylaws of the Company dated as of August 7, 2012 (the "**Bylaws**").

C.      The Investor understands that the Company proposes to offer to a limited number of accredited investors (including the Investor) the Shares and that a number of other investors may purchase Shares pursuant to subscription agreements substantially similar to this Subscription Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the promises and covenants contained in this Subscription Agreement, the Company and the Investor hereby agree as follows:

1.      <u>Sale and Acquisition of the Shares.</u>  In accordance with the terms and conditions of this Subscription Agreement, the Investor hereby unconditionally agrees and obligates itself (a) to acquire from the Company the Shares having the terms, rights and preferences set forth in the Articles of Incorporation and (b) to make payment for the Shares at a cash price of $[___] per Share, which shall be payable in cash by wire transfer of immediately available funds to one or more accounts designated by the Company.  Upon the Company's acceptance of the Investor's subscription, and the Investor's execution and delivery of this Subscription Agreement and payment to the Company for the Shares, the Investor shall be a shareholder of the Company.  This subscription for the Shares may be accepted or rejected by the Company for any reason in its sole discretion.

2.      <u>Representations and Warranties of the Company.</u>  The Company represents and warrants to the Investor, as of the date of this Subscription Agreement as follows:

(a)      The Company is duly organized and validly existing under the laws of the State of Florida.

(b)      All company action on the part of the Company and the Board of Directors of the Company (the "**Board**") necessary for the authorization, execution, delivery and performance of all obligations of the Company under this Subscription Agreement, to issue and sell the Shares, and for the authorization, issuance, reservation for issuance and delivery of all of the Shares being sold under this Subscription Agreement, has been taken or will be taken prior to the issuance of the Shares.

(c)      The Shares issued hereunder will, when issued and paid for as provided herein, be duly authorized, validly issued, fully paid and non-assessable.  The rights, preferences, privileges and restriction of the Shares will be as stated in the Articles of Incorporation.

3.    <u>Representations and Warranties of the Investor.</u> The Investor represents and warrants to the Company, and agrees, as applicable, that as of the Effective Date:

(a)    THE INVESTOR ACKNOWLEDGES THAT IT HAS BEEN PROVIDED WITH THE OPPORTUNITY TO ASK QUESTIONS OF THE COMPANY AND TO REQUEST INFORMATION PERTAINING TO THE COMPANY.

(b)    This Subscription Agreement has been duly authorized, executed and delivered by the Investor and constitutes the Investor's legal, valid and binding obligation enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies. If the Investor is a corporation, limited liability company, trust or partnership, it is authorized to make the investment contemplated herein, and the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so.

(c)    The Investor is acquiring the Securities for the Investor's own account for investment and not as a nominee or agent and not with a view to resale or distribution. The Investor understands that the Securities have not been, and will not be, registered under the Securities Act of 1933 Act, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Investor's representations and warranties as expressed herein. If the Investor is a corporation, limited liability company, trust or partnership, it has not been formed for the purpose of acquiring the Securities.

(d)    The Investor: (i) has carefully read and has relied solely (except as indicated in subsection (ii) below) on the information contained in this Subscription Agreement and (ii) has been given the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of the Securities and the business of the Company, and to obtain such additional information that was otherwise provided.

(e)    The Investor has not been provided with, nor has it requested, nor does it have any need to receive, an offering memorandum or any similar document in connection with its subscription for the Shares, and its decision to execute this Subscription Agreement and to purchase the Shares has been based entirely upon its own due diligence review of the Company.

(f)    No agency, governmental authority, regulatory body, stock exchange or other entity has made any finding or determination as to the merit for investment of, nor have any such agencies or governmental authorities made any recommendation or endorsement with respect to the Shares;

(g)    The purchase of the Shares has not been made through, or as a result of, and the distribution of the Shares is not being accompanied by, and the Investor is not aware of, any form of general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media, or broadcast over radio, internet or television, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(h)    The Investor recognizes (i) that acquisition of the Securities involves a high degree of risk and has taken full cognizance of and understands such risks; (ii) that all information provided, if any, by the Company relating to its use of proceeds, financial forecasts, appraisals and other information that is not of an historical nature represents only the Company's good faith assessment of its future expenses, revenues, operations and prospects, as applicable, and is based upon assumptions that the Company believes are reasonable, although no assurance exists that such forecasts and assumptions will be fulfilled; and (iii) that the Company has relied on the representations of the Investor as set forth in this <u>Section 3</u> in determining materiality for purposes of satisfying the disclosure obligations of the Company

2

and in determining the availability of exemptions from registration requirements under federal and state securities laws.

(i)     The Investor fully understands and agrees that the Investor must bear the economic risk of the acquisition of the Securities for an indefinite period of time because, among other reasons, the Securities have not been registered under the Securities Act or the securities laws of any state, and therefore cannot be sold, pledged, assigned, transferred, hypothecated or otherwise disposed of unless they are subsequently registered under the Securities Act and applicable state securities laws or exemptions from such registration requirements are available.  The Investor understands that no public market now exists for any of the Securities issued by the Company, that the Company has made no assurances that a public market will ever exist for any of the Securities, and that, even if such a public market exists at some future time, the Company may not then be satisfying the current public information requirements of Rule 144 of the Securities Act such that the availability of the exemption from the registration requirements of the Securities Act provided by Rule 144 would be limited, delayed or eliminated.  The Investor further understands and agrees that the Company will not honor any attempt by the Investor to sell, pledge, assign, transfer, hypothecate or otherwise dispose of all or any portion of the Securities, in the absence of an effective registration statement for the Securities under the Securities Act and applicable state securities laws or an unqualified opinion of counsel, satisfactory in form and substance to the Company and its counsel, that exemptions are available therefrom with respect to such attempted disposition.

(j)     The Investor (i) can bear the risk of losing the entire investment; (ii) has overall commitments to other investments that are not readily marketable and not disproportionate to his, her or its net worth, and the investment in the Securities will not cause such overall commitment to become excessive; (iii) has adequate means of providing for current needs and personal contingencies and has no need for liquidity in the investment in the Securities; and (iv) has sufficient knowledge and experience in financial and business matters such that it is capable, either alone, or together with one or more advisors who have advised the Investor in connection with the acquisition of the Securities, of evaluating the risks and merits of investing in the Securities.

(k)     The Investor has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finder's fees or agent's commissions or any similar charges in connection with this Subscription Agreement (not including any fees that may be payable by the Investor to its advisor).

(l)     The Investor acknowledges that it must depend entirely upon its own advisors for tax advice concerning an investment in the Company, that the Company has not provided any information on tax matters, and that any information provided to it by, or on behalf of, the Company is not to be construed as tax advice to it from counsel to the Company.  The Investor will rely solely on its advisors and not on any statements or representations of the Company or any of its agents, and understands that the Investor (and not the Company) shall be responsible for the Investor's own tax liability that may arise as a result of this investment, the transactions contemplated by this Subscription Agreement, or any future transfer of the Securities.

(m)     The Investor has independently, and based on such information as Investor has deemed appropriate, made its own analysis and decision to purchase the Shares, (b) has consulted with its legal counsel and other advisors to the extent it deems necessary, and (c) waives any right to rescind or invalidate its investment in the Company or to seek any damages or other remuneration from the Company, or any affiliates or successors thereof.

(n)     The representations and warranties made in this Section 3, as well as all other information that the Investor has provided to the Company, either directly or indirectly, concerning the Investor's financial position and knowledge of financial and business matters, is correct and complete as

3

of the date hereof, and if there should ever be any material change in such information prior to the issuance to it of the Securities, the Investor will immediately notify the Company.

(o) *The Investor qualifies as an "accredited investor" as such term is defined under Rule 501 of the Securities Act and has checked the applicable box on the attached __Exhibit A__ to this Subscription Agreement the Investor's qualification as an accredited investor.*

4. Legend. The Investor agrees that any certificates or other evidence of or for any and all of the Securities will include the below legend in addition to any other legend required by the Articles of Incorporation or Bylaws. The Investor consents to the Company making a notation on its records and giving instructions to any transfer agent of any of the Securities in order to implement the restrictions established therein:

> THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR ANY OTHER APPLICABLE SECURITIES ACT (THE "ACTS"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR OTHERWISE DISTRIBUTED, UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS COVERING SUCH SECURITIES OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES (CONCURRED ON BY COUNSEL FOR THE COMPANY) STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT, PLEDGE OR DISTRIBUTION IS EXEMPT FROM OR IN COMPLIANCE WITH THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACTS.

5. **GOVERNING LAW AND CHOICE OF FORUM**. THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING AS TO VALIDITY, INTERPRETATION AND EFFECT, BY THE INTERNAL LAWS OF THE STATE OF FLORIDA, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS RULES THEREOF. ANY AND ALL LITIGATION CONCERNING ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL BE FILED AND MAINTAINED ONLY IN A STATE OR FEDERAL COURT SITTING IN FLORIDA.  THE MEMBERS HEREBY IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS.

6. Binding Effect. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of, the parties and their heirs, executors, administrators, successors, legal representatives and assigns.

7. Notice. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Subscription Agreement shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient, (b) sent to the recipient by reputable express courier service (charges prepaid), (c) mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid or (d) sent via facsimile or electronic mail to the recipient if sent before 5:00 p.m., Florida time on a business day, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address shown on the Company's records, in the case of the Investor, and to the Company's principal office, in the case of the Company, or to such other names or addresses as the Company or the Investor, as the case may be, shall designate by notice to the other party in the manner specified in this Section 7.

8. Severability. Every provision of this Subscription Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Subscription Agreement.

9. Entire Agreement. This Subscription Agreement constitute the entire agreement by and between the parties pertaining to the subject matter hereof as a complete and final integration thereof and

4

MMS000312

supersede all prior and contemporaneous negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect hereto.

10.   <u>Variation in Pronouns.</u>  All pronouns shall be deemed to refer to masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

11.   <u>Counterpart Execution.</u>  This Subscription Agreement may be executed and delivered in any number of counterparts, any one of which need not contain the signatures of all the parties hereto, with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

12.   <u>Electronic Delivery.</u>  This Subscription Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, facsimile, portable document format (.pdf) or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

13.   <u>WAIVER OF JURY TRIAL.</u>  INVESTOR WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS SUBSCRIPTION AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED IN CONNECTION HEREWITH OR HEREAFTER AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

14.   <u>Costs.</u>  All costs and expenses incurred by the Investor relating to its purchase of Shares shall be borne by the Investor.

15.   <u>Headings.</u>  Section and other headings contained in this Subscription Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

16.   <u>Legal Counsel; Potential Conflicts.</u>  The Investor acknowledges and agrees that DLA Piper LLP (US) (the "**Law Firm**") has acted as legal counsel to the Company in connection with the issuance of the Shares hereunder and that the Law Firm is not representing the Investor in connection with the issuance of the Shares hereunder.  The Investor further acknowledges and agrees that the Law Firm has in the past and may from time to time in the future render services to the Company and its affiliates whether or not such services are related to or unrelated to the issuance of the Shares contemplated hereby.

**[SIGNATURE PAGE FOLLOWS]**

WEST\270088684.1

IN WITNESS WHEREOF, this Subscription Agreement has been duly executed by the Company and the undersigned Investor, or its duly authorized officer or trustee, as the case may be, as of the Effective Date.

**INVESTOR SIGNATURE**:

**Total Investment** (see Exhibit B for wiring instructions): $ *O* — *2,000,000 FOUNDERS SHARES OF COMMON STOCK ISSUED FOR PATENTS FOR NO CONSIDERATION* ⁂

Date: _6/24/16_

_EDWARD MANFORT TRUSTEE OF THE MANFORT REVOCABLE LIVING TRUST_
(Print Name of Investor)

By: _____ Trustee

Title (if applicable): _TRUSTEE_

Telephone Number: _____

Facsimile Number: _____

_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_
Social Security or Taxpayer ID Number

Address: _____
_____
_____

State of Residence for Tax Purposes: _CA_

Jurisdiction of Organization: _CA_

Consent to receive notices by e-mail address: (Yes) No____

E-mail Address: _edl.m/@ adomani electic.com_

Type of Entity:

Individual:__ Corporation:__ Partnership:__ Limited Liability Company:__ Trust: ✓ Other:__

Is the Investor Tax-Exempt under Section 501(a) of the Internal Revenue Code? Yes_____ No___

**ACCEPTED BY THE COMPANY:**

ADOMANI, Inc.

By: _____
Name: _Edwin Kawasaki_
Title: _COO_
Effective Date: _07/29/2016_

⁂ For Patents After 2012

(EM) _EM_

**EXHIBIT A**
**SUBSCRIPTION AGREEMENT**

**ACCREDITED INVESTOR REPRESENTATION**

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the **"Securities Act"**), and has checked the box or boxes below which are next to the category or categories under which the Investor qualifies as an accredited investor:

FOR INDIVIDUALS:

☐ (A) A natural person with individual net worth (or joint net worth with spouse) in excess of $1 million. For purposes of this item, "net worth" means the excess of total assets at fair market value (excluding the value of an individual's primary residence), including property owned by a spouse, over total liabilities.

☐ (B) A natural person with individual income (without including any income of the Investor's spouse) in excess of $200,000, or joint income with spouse in excess of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

FOR ENTITIES:

☐ (A) An entity, including a grantor trust, in which all of the equity owners are accredited investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐ (B) A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity.

☐ (C) An insurance the company as defined in Section 2(a)(13) of the Securities Act.

☐ (D) A broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

☐ (E) An investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act").

☐ (F) A business development company as defined in Section 2(a)(48) of the 1940 Act.

☐ (G) A small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended.

☐ (H) A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended.

☐ (I) An organization described in Section 501(c)(3) of the Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Shares, with total assets in excess of $5 million.

☒ (J) A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares.

☐ (K) An employee benefit plan within the meaning of the Employee Retirement Security Act of 1974, as amended ("ERISA") if:

- the decision to invest in the Shares is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or
- if the employee benefit plan has total assets in excess of $5 million or,
- if a self-directed plan, with investment decisions made solely by persons that are

B-1

accredited investors.

☐ (L)   A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if the plan has total assets in excess of $5 million.

WEST\270088684.1

## EXHIBIT B

### WIRING INSTRUCTIONS

[_____]

Bank account information:

Bank Name:
ABA No.:
Account Name:
Account No.:
Reference:

EXHIBIT J

**ADOMANI, INC.**
**AGREEMENT OF CANCELLATION OF PREFERRED STOCK OPTIONS**

THIS AGREEMENT OF CANCELLATION OF PREFERRED STOCK OPTIONS (this "**Agreement**") is made and entered into effective as of *Nov 18*, 2016 (the "**Effective Date**") by and between ADOMANI, Inc., a Florida corporation (the "**Company**"), and Edward R. Monfort (the "**Optionee**").

## RECITALS

A.    The Company issued to the Optionee, pursuant to the ADOMANI, Inc. 2012 Preferred Stock Option Plan, 3,000,000 options to purchase shares of the Company's preferred stock on June 1, 2014 (the "**Option**") as set forth in Exhibit A attached hereto.

B.    The Option remains unexercised in its entirety as of the date of this Agreement.

C.    The Company intends to reincorporate from a Florida corporation to a Delaware corporation pursuant to an agreement and plan of merger (the "**Reincorporation**").

D.    To effect the Reincorporation, the Optionee and the Company hereby wish to provide for the cancellation of the Option as of and immediately upon the Effective Date.

## AGREEMENT

In consideration of the mutual covenants and conditions contained herein, it is hereby agreed by and among the parties hereto as follows:

1.    <u>Consideration; Cancellation of Outstanding Option</u>.  In exchange for the benefits of the Reincorporation, the Optionee hereby relinquishes any right or interest that the Optionee may have had, may have, or may acquire in the future, with respect to the Option and the shares of the Company's preferred stock to which the Option pertained.  Upon execution of this Agreement, the Option shall be terminated and canceled and shall have no further force or effect.

2.    <u>Applicable Law</u>.  This Agreement shall be governed by the laws of the State of California as such laws are applied to agreements between California residents entered into and to be performed entirely within the State of California.

3.    <u>Optionee Representations, Warranties and Covenants</u>.  In connection with the cancellation of the Option, Optionee represents and warrants as follows:

(a)    <u>Ownership of Option</u>.  Optionee has good, valid and marketable right, title and interest (legal and beneficial) in and to all of the Option, free and clear of all liens, pledges, security interests, claims or encumbrances of any kind.

(b)    <u>No Conflict</u>.  The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not result in a breach or violation by Optionee of, or conflict with, or constitute a default by Optionee under, (i) any agreement, instrument, decree, judgment or order to which Optionee is a party, to which the properties of Optionee may be

WEST\274383563.1

subject or by which Optionee may be bound, or (ii) any provision of any federal, state or other applicable statute, rule or regulation applicable to Optionee. Optionee has not granted any options of any sort with respect to the Option or any right to acquire the Option or any interest therein.

(c)     Litigation.  There is no action, suit, proceeding or investigation pending, or currently threatened, against Optionee that questions the validity of this Agreement or the right of Optionee to enter into this Agreement, or to consummate the transactions contemplated hereby.

(d)     No Continuing Rights.  Optionee hereby acknowledges that, solely with respect to the Option, Optionee shall hereinafter have no rights as a shareholder of the Company with respect to any future sale, acquisition, merger, liquidation, dissolution, public offering or other corporate event regarding the Company or its assets (any of the foregoing, a "**Corporate Event**") by reason of Optionee's ownership of the Option prior to the cancellation of the Option pursuant to this Agreement. Optionee further expressly acknowledges that any such Corporate Event may result in the payment by the Company of assets, funds or other proceeds to the Company's shareholders or an enhancement in value of the Company's securities.  Optionee hereby acknowledges and agrees that, under the foregoing circumstances or upon any such Corporate Event, Optionee shall have no right to or interest in any such assets, funds, proceeds or enhanced value by reason of Optionee's ownership of the Option.  The Optionee further agrees that this Agreement shall be binding upon the Optionee's estate, heirs, descendants, spouse, children, assignees, creditors, and legal and personal representatives.

(e)     Tax Matters.  Optionee has had opportunity to review with Optionee's own tax advisors the federal, state and local tax consequences of the cancellation of the Option and the transactions contemplated by this Agreement.  Optionee is relying solely on such advisors and not on any statements or representations of the Company or any of its respective representatives, agents, advisors or legal counsel.  Optionee understands that Optionee (and not the Company) shall be responsible for Optionee's own tax liability that may arise as a result of the transactions contemplated by this Agreement.

(f)     Access to Information.  Optionee hereby acknowledges and agrees that Optionee has had an opportunity to discuss the Company's business, management and financial affairs with the Company's management and the opportunity to inspect Company facilities and such books and records and material contracts as the Optionee deemed necessary to its determination to cancel the Option.

(g)     No Consent.  No consent, authorization, approval, order, license, certificate or permit or act of or from, or declaration or filing with, any foreign, federal, state, local or other governmental authority or regulatory body or any court or other tribunal or any party to any contract, agreement, instrument, lease or license to which Optionee is a party, which has not yet been obtained is required for the execution, delivery or performance by Optionee of this Agreement or any of the other agreements, instruments and documents being or to be executed and delivered hereunder or in connection herewith or for the consummation of the transactions contemplated hereby.

[Signature Page Follows]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of and shall be effective as of the date first set forth above.

ADOMANI, INC.

By:
Name:  Michael K. Menerey
Title:  Chief Financial Officer

OPTIONEE

Edward R. Monfort