UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

EDWARD R. MONFORT,

Plaintiff,

v.

ADOMANI, et al.,

Defendants.

Case No. 18-CV-05211-LHK

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 82

Plaintiff Edward Monfort brings the instant lawsuit against Defendants ADOMANI, INC. ("Adomani"); its President and Chief Executive Officer, James L. Reynolds; its Chief Financial Officer, Michael K. Menerey; its Vice President, Robert E. Williams; its former Chief Operating Officer and Secretary, Kevin G. Kanning; and its former consultant, Dennis Di Ricco (collectively, "Defendants").

Before the Court is Defendants' motion for summary judgment. ECF No. 82. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendants' motion for summary judgment as to all of Monfort's claims.

I.     **BACKGROUND**

## A. Factual Background

Monfort is a resident of Florida and is a co-founder and former Chief Executive Officer of Adomani. ECF No. 79, First Amended Complaint ("FAC")[1], at ¶¶ 1, 5. Adomani is a publicly traded Delaware corporation with its principal executive offices in California. *Id.* ¶ 11. At various points throughout Monfort's tenure with Adomani, Monfort claims to have received significant amounts of Adomani common stock and stock options, which are at the heart of this dispute. The record suggests an increasingly contentious relationship between Monfort and Adomani's other executives, up to and including Monfort's termination in March 2018. Notwithstanding the voluminous exhibits detailing the minutiae of the parties' disagreements, the Court will focus on those facts which are relevant to this motion.

### 1. Monfort and Di Ricco Found Adomani

Monfort, an inventor, partnered with Dennis Di Ricco, a tax advisor, to establish a business commercializing Monfort's patent for an electric drivetrain. ECF No. 82–1 ("Wolf Decl."), Ex. K ("Di Ricco Dep.") at 32:19–34:15. In 2012, they incorporated the business in Florida as ADOMANI, INC. *Id.* at 34:10–21; ECF No. 82-5 ("Di Ricco Decl."), Ex. A. As between Monfort and Di Ricco, the two initially agreed that Monfort and Di Ricco would divide any shares of Adomani between them at a ratio of 60% to 40%, respectively. Di Ricco Dep. 33:25–34:9. Throughout 2012, Di Ricco raised capital for Adomani, and, during this time, the company received investments from Kanning, Williams, and the Acaccia Family Trust ("Acaccia"), for which Di Ricco was the trustee. Di Ricco Dep. 35:25–37:4, 51:15–19.

In 2012, Monfort and Adomani entered into a number of stock subscription agreements whereby Adomani agreed to sell Monfort over 30 million shares of Adomani stock for $0.002 per share (the "Disputed Agreements"). *See* ECF No.86 ("Monfort Decl.") ¶ 9, Ex. H. Although the

---

[1] The First Amended Complaint was originally filed on March 26, 2019, at ECF No. 44. However, the Court subsequently granted the parties' stipulated request to replace this document and other filings because they inadvertently contained confidential information. ECF No. 81. For example, ECF No. 79 replaces the First Amended Complaint that was originally filed as ECF No. 44. Where applicable, the Court's citations throughout this Order will be to the corrected, publicly available filings on the docket.

parties agree that Monfort assigned a patent to Adomani in consideration for some of the stock, the

parties dispute whether Monfort ever provided sufficient consideration to purchase the stock

pursuant to the subscription agreements.  Mot. at 4, 6 n.5; Opp'n at 3.  Some of the subscription

agreements themselves contain annotations on the signature pages: "Patent Value," "Shares Issued

for Patents," and "For Patents After 2012."  Monfort Decl., Ex. H.  Finally, the parties also dispute

whether Adomani's board followed the proper procedure under Florida corporate law to issue the

disputed shares of stock.  Mot. at 5–6; Opp'n at 11–12.  Nonetheless, the parties agree that

Monfort did eventually receive at least 4 million shares of common stock.  Mot. at 1; Opp'n at 17

n.103.  Moreover, despite Monfort's argument that he paid for shares through assignments of his

patents, *see* Opp'n at 10, Monfort also stated that Di Ricco, on behalf of Acaccia Trust, paid for

the shares.  Monfort Dep., Ex 12 ("I didn't have to pay for them because Dennis paid for them for

me . . . .");  *see also* Wolf Decl., Ex. B ("Menerey Dep.") 60:24–61:10; Di Ricco Dep. 188:25–

189:9; Wolf Decl., Ex. H ("2d 30(b)(6) Dep.") 44:12–45:3.  Monfort testified that he did not

receive copies of the Disputed Agreements at that time.  Monfort Dep. 72:1–5.

      Additionally, Adomani and Monfort entered into separate agreements granting Monfort the

option to purchase 15 million shares of Adomani common stock (collectively, the "Option

Agreements").  Specifically, Adomani granted Monfort an option to purchase 12 million shares of

common stock in November 2012, and an option to purchase 3 million shares of preferred stock in

June 2014.[2]  Monfort Decl., Ex. H.  The Option Agreements incorporate the terms set forth in

Adomani's 2012 Common Stock Option Plan and 2012 Preferred Stock Option Plan, respectively.

*Id; see* Di Ricco Decl., Ex. C (the "2012 Common Stock Option Plan").  The parties agree that,

pursuant to the 2012 Common Stock Option Plan, Adomani could terminate Monfort's stock

options in the event of his termination of employment "for cause."  Mot. at 21; Opp'n at 4; *see*

---

[2] Later, upon reincorporation in Delaware, the new Adomani Delaware entity assumed the
obligations of these stock plans, ECF No. 82–2 ("Menerey Decl."), Ex. P at 8, and converted all
options to purchase preferred stock into options to purchase common stock, Menerey Decl., Ex. N.
Accordingly, the parties refer collectively to Monfort's option to purchase 15 million shares of
common stock, and the Court will do the same.

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2012 Common Stock Option Plan.

## 2. Disputes Over Monfort's Stock Ownership

In the years that followed, prior to Adomani's initial public offering ("IPO"), Adomani's record-keeping of its stock ownership was "sloppy" and "a mess." Wolf Decl., Ex. E ("Raymond Dep.") 38:9–39:3; 2d 30(b)(6) Dep. 35:12–15. Adomani's internal records and public filings were inconsistent and, at times, reflected Monfort's ownership of up to 34,280,000 shares of Adomani common stock. *See, e.g*, ECF No. 83, Ex. D. However, in 2014, Adomani hired James Reynolds and Michael Menerey to join the executive team, in part to reconcile Adomani's stock records to prepare for the IPO. Wolf Decl., Ex. J ("Reynolds Dep.") 22:7–18, 26:6–12, 160:6; Menerey Dep. 15:14–16.

During this process, a dispute arose between Monfort and the rest of Adomani's management regarding Monfort's ownership and entitlement to stock. Monfort hired a lawyer, J. Paul Raymond and called an emergency board meeting on May 4, 2016. Monfort Dep. 72:1-9. During the meeting, Monfort argued with the rest of the board over his stock position; however, the board insisted that Acaccia purchased the disputed shares and that any agreement between Monfort and Acaccia would need to be addressed with Di Ricco. ECF No. 82-3 ("Kanning Decl."), Ex. D at 3–5. The board then voted to allow Acaccia to rescind its purchase of 36 million shares of stock (later corrected to 34 million), in connection with the IPO, where Monfort was the sole dissenting vote. *Id.* In that same meeting, the board also unanimously voted to approve issuance of all purchased shares of common stock to the purchasers, and to affirm that Monfort had only 900,000 shares of stock, against Monfort's dissenting vote. Wolf Decl., Ex. A ("Kanning Dep."), Ex. 4. Menerey later clarified that, because neither he nor Di Ricco had been invited to the meeting, the 900,000 number discussed by the board had not been verified, and that the number of Monfort's shares "should have been 4 million, 2 million of which had been issued." Menerey Decl., Ex. L. Di Ricco, as trustee for Acaccia, subsequently proceeded to rescind his agreement with Acaccia to purchase of over 30 million shares. Menerey Decl., Ex. C; *but see* Opp'n at 7 n.43 (noting discrepancies in total number of shares rescinded).

United States District Court
Northern District of California

### 3.  Negotiation of 2016 Employment Agreement and Release

Monfort, represented by Raymond, continued to dispute ownership of the company's stock with Adomani's management.  Raymond Dep. 53:20–54:13.  Reynolds testified that he had recurring issues with Monfort's job performance, *see, e.g.*, Reynolds Dep. 114:25–115:15, and Monfort had already expressed his desire for a new employment agreement, Kanning Dep., Ex. 4.  The parties dispute exactly what was communicated during the negotiation process and what documents Monfort already had in his possession at the time.  Monfort testified, "I knew I was giving up the 34, 38 million shares, but it was—it was not an informed decision when I signed [the agreement], and I was deceived by Adomani."  Monfort Dep. 70:17–20.  He explained, "Adomani and the Counsel told me and my attorney that the fully executed subscription agreements that I had from 2012 did not exist . . . ."  *Id.* at 70:23–25.  However, Monfort was unable to identify anyone specifically who had told him that the subscription agreements did not exist.  *Id.* 72:15–73:8.  His then-attorney, Raymond, testified that it was Adomani's attorney, Conrad Lysiak, who stated that the Disputed Agreements did not exist.  Raymond Dep. 56:22–57:4, Ex. 38.  However, Raymond testified that he did have "evidence in [his] possession that [Monfort] owned a substantial number of shares."  *Id.* 17:17–17:25.

On June 23, 2016, Monfort and Adomani executed the 2016 Employment Agreement, which included as an attachment a general release of all claims existing prior to execution of the 2016 Employment Agreement (the "Release").  Monfort Dep., Ex. 10.  The agreement set forth Monfort's employment as "Chief Technology Officer" with an annual salary of $120,000.  *Id.* at 1.  The Employment Agreement contained a separate clause "Other Consideration," whereby the parties agreed:

> In consideration for Executive's execution of a general release in the form attached hereto as Exhibit A, the Company will pay Executive the sum of $200,000.00 to ELO, LLC [(Monfort's separate corporate entity)]. . . . In addition, Company agrees to pay to ELO, LLC for two years, commencing June 1, 2016 through May 31, 2018, up to $7,000.00 per month for invoiced expenses.

*Id.* at 2.  The Release itself specifies that Monfort "generally releases and forever discharges [Adomani] . . . and their respective officers, directors, employees . . . from any and all claims,

5

liabilities, demands, causes of action . . . of every kind and nature, whether known or unknown, arising at any time prior to the date Executive signs this Employment Agreement." *Id.* at 6.

Monfort subsequently received copies of the Disputed Agreements in a July 19, 2016 email from Menerey that asked Monfort to void or cancel all four subscription agreements "in order to clean up our files before the IPO." Monfort Dep., Ex. 11. Monfort was unable to recall how he responded when he received the Disputed Agreements in Menerey's email, other than that "it jarred [his] memory." Monfort Dep. 78:5–83:23.

### 4. Adomani's IPO and Monfort's Termination

Thereafter, Monfort and the parties proceeded under the terms of the 2016 Employment Agreement and Release. For example, Monfort completed a number of forms in which he represented that he owned only 4 million shares of stock and 15 million stock options. *See, e.g.*, Monfort Dep., Ex. 13 at 15; Menerey Decl, Exs. I–K, M, X. Monfort further helped to facilitate Adomani's reincorporation in Delaware and its IPO. *See, e.g.*, Kanning Decl., Ex. F.

In June 2017, Monfort was suspended without pay. Reynolds Dep. 243:1–3. Adomani hired EXTTI, Inc. ("EXTTI"), a third-party firm, to investigate suspicions of Monfort's workplace misconduct. Wolf Decl. Ex I ("Sniderman Dep.") 8:10–17, 11:11–24. Monfort declined to directly participate in the investigation at the advice of counsel despite orders to the contrary, although his counsel acted on his behalf throughout. Sniderman Dep. 28:23–32–7; *see, e.g.*, ECF No. 82-4 ("Hamer Decl."), Ex. A. EXTTI delivered its principal conclusions to the board verbally around February 2018, Menerey Decl. ¶ 27, ultimately finding that "more likely than not, Monfort did participate in the activities of misconduct stated in six of the seven allegations." Sniderman Dep., Ex. 1, at 4 (footnote omitted). Accordingly, the board of directors determined that cause existed to terminate Monfort's employment, and Monfort was officially terminated in March 2018. Monfort Decl. ¶ 16. Monfort had attempted to exercise his options just two days before his termination. *Id.* ¶ 15. This suit followed.

### B. Procedural History

On August 2, 2018, Monfort filed his initial complaint in Superior Court for the County of

1  Santa Clara, alleging claims for (1) breach of contract, (2) fraud, (3) fraudulent inducement, and

2  (4) declaratory relief. ECF No. 74. On August 24, 2018, Defendants removed Monfort's case to

3  this Court on the basis of diversity jurisdiction. ECF No. 1. On September 24, 2019, Monfort

4  moved to remand the case to state court, ECF No. 9, which the Court denied on January 8, 2019,

5  ECF No. 30.

6  On March 26, 2019, Monfort filed his First Amended Complaint. ECF No. 79.

7  Defendants (with the exception of Di Ricco) filed an answer and asserted counterclaims against

8  Monfort for (1) breach of the 2016 Employment Agreement and Release, (2) declaratory

9  judgment, (3) breach of fiduciary duty, (4) wrongful dilution of equity, and (5) conversion. ECF

10  No. 37. On May 15, 2019, Monfort answered Defendants' counterclaims. These counterclaims

11  are not raised in any motion for summary judgment before the Court. ECF No. 58. On June 4,

12  2019, Di Ricco separately filed his answer. ECF No. 59.

13  Defendants jointly filed the instant motion for summary judgment on September 12, 2019.

14  ECF No. 82 ("Mot."). Monfort opposed the motion for summary judgment on September 26,

15  2019, ECF No. 85 ("Opp'n")[3], and Defendants replied on October 3, 2019, ECF No. 85

16  ("Reply").[4]

17  ## II.  LEGAL STANDARD

18  Summary judgment is proper where the pleadings, discovery, and affidavits show that

19  there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

20  a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of

21

22  [3] Monfort's opposition includes 129 footnotes, some of which extend up to 13 lines. Monfort's
129 footnotes fail to comply with Local Rule 3-4(c)(2), which requires that footnotes be the same
23  font size as the text. In addition, Monfort filed a declaration that, in essence, appends his legal
argument, including a chart that spans over nine pages and that purports to identify fraudulent
24  statements and why each statement was false when made. *See* Monfort Decl. 3–11. These tactics
circumvent the page limits set forth in the Civil Local Rules. The Court will strike any such future
25  filings.
[4] Both parties request that the Court judicially notice certain publicly available documents, *see*
26  ECF Nos. 83, 88, and neither side opposes. A court may take judicial notice of the existence of
matters of public record but not the truth of the disputed facts cited therein. *Lee v. City of Los*
27  *Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Accordingly, the Court GRANTS the parties'
requests for judicial notice.

28

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the case.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III.   DISCUSSION

Monfort asserts four claims in his First Amended Complaint.  Count One alleges breach of Monfort's 2012 stock subscription agreements (the "Disputed Agreements") and two agreements granting Monfort 15 million options to purchase stock (the "Option Agreements").  Count Two alleges fraud with respect to a number of purported misrepresentations about Monfort's ownership of stock and options.  Count Three alleges fraudulent inducement into signing the 2016 Employment Agreement, which included as an attachment a general release of all claims existing prior to execution of the 2016 Employment Agreement (the "Release").  Count Four seeks declaratory relief as to Monfort's ownership of stock and options.

Defendants move for summary judgment as to Counts One, Two, and Three, and ask the Court to dismiss Count Four.  Specifically, Defendants argue that the Release bars all of Monfort's claims, with the exception of Monfort's allegation in Count One that Adomani breached the

8

Option Agreements. Mot. at 11 n.13. Defendants further argue that there is no genuine dispute of material fact as to breach of the Option Agreements because the agreements allowed Adomani to terminate Monfort's options upon termination for cause. Mot. at 23–25. Finally, Defendants argue that the Court should exercise its discretion to dismiss Count Four in its entirety because declaratory relief would be "superfluous." Mot. at 25.

Monfort argues that the Release does not bar any of his claims because he was fraudulently induced into signing the Release and because the terms of the Release do not reach Monfort's claims against the individual defendants. Opp'n 16–25. Defendants counter that, even if Monfort had a claim of fraudulent inducement, his conduct in the two years following his discovery of the alleged fraud amount to ratification of the Release as a matter of law. Mot. at 11–16. Defendants also contend that the Release unambiguously extends to claims against the individual defendants. Reply at 9–10.

Monfort also argues that summary judgment as to his allegation in Count One that Adomani breached the Option Agreements would be inappropriate because whether his termination was for cause is a "classic jury question." Opp'n at 12–14. Finally, Monfort argues that the existence of genuine disputes of material fact as to his ownership of stock and options precludes summary judgment for Count Four, his claim for declaratory relief. Opp'n at 11 n.79.

The Court first addresses whether Monfort ratified the Release. After finding that Monfort ratified the Release, the Court addresses whether the Release extends to Monfort's claims against the individual defendants. Finally, the Court addresses each of Monfort's claims in turn.

**A. Monfort Ratified the Release**

Defendants argue that Monfort ratified the Release through his conduct for about two years after discovering the alleged deceit, and this delay impermissibly prejudiced the rights of Defendants and other parties. Mot. at 11, 14. Monfort argues that he did not ratify the Release because his conduct was without "full knowledge" of Defendants' bad conduct. Opp'n at 20–23. Here, the Court finds Monfort's delay and subsequent conduct, as well as the resulting prejudice, to be so substantial as to give rise to ratification of the Release as a matter of law.

9

The 2016 Employment Agreement explicitly provides consideration (including, most substantially, $200,000) in exchange for Monfort's execution of the Release on June 23, 2016. Monfort Dep., Ex. 10, at 2. The Release provides that Monfort "generally releases and forever discharges the Company, its parent, subsidiary, affiliated and related entities, and its and their respective officers, directors, employees . . . from any and all claims, liabilities, demands . . . whether known or unknown, arising at any time prior." *Id.* at 5. The Release specifies that the general release includes "claims related to breach of contract, tort, wrongful termination, discrimination, wages or benefits, or claims for any form of compensation, benefits, equity or other ownership." *Id.* Finally, the Release states: "[Monfort] acknowledges and represents that, with the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off . . . stock, stock options, vesting, and any and all other benefits and compensations due to [Monfort]." *Id.*

The 2016 Employment Agreement includes a choice of law provision stipulating that California law governs claims arising out of the agreement. *See* Monfort Dep., Ex. 10, at 5. The parties apply California law to ascertain whether Monfort ratified the agreement, and the Court does the same.

A fraudulently induced contract is voidable, not void. *See Vill. Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 237 P.3d 598, 602 (Cal. 2010). In California, a party seeking rescission must "promptly upon discovering the facts which entitle him to rescind" give notice of rescission to the other party and offer to restore the other party's consideration under the contract. *Vill. Northridge*, 237 P.3d at 602 (citing Cal. Civ. Code § 1691). California further provides that, where notice of rescission and an offer to restore contract benefits has not otherwise been made, "the service of a pleading in an action . . . shall be deemed to be such notice or offer or both." Cal. Civ. Code § 1691.

Even where a contract is voidable, a party may act to ratify the contract, and thus "waive[] the right to assert the invalidity of the release." *Aikins v. Tosco Ref. Co.*, No. C-98-00755-CRB, 1999 WL 179686, at *4 (N.D. Cal. Mar. 26, 1999). Ratification occurs when the defrauded party,

"with full knowledge of the material facts permitting rescission, has engaged in some unequivocal conduct giving rise to a reasonable inference that he or she intended the conduct to amount to a ratification." *Id.* (citing *Union Pac. R.R. Co. v. Zimmer*, 87 Cal. App. 2d 524, 532 (1948)). "Whether the releasor has [knowledge of the facts permitting rescission], and whether retention has been for an unreasonable length of time, are normally questions for the trier of fact." *Zimmer*, 87 Cal. App. 2d at 532. However, California courts have taken the question away from the jury where the delay and resulting prejudice are so substantial as to be unreasonable as a matter of law. *See, e.g.*, *Saret-Cook v. Gilbert, Kelly, Crowley & Jennett*, 74 Cal. App. 4th 1211, 1225–26 (1999) (five-month delay); *Eustace v. Lynch*, 43 Cal. App. 2d 486, 487–89 (1941) (two-month delay).

### 1. Monfort's knowledge of his right to rescind

As an initial matter, the parties dispute exactly what alleged fraud Monfort claims induced his agreement to the Release, and exactly when Monfort "first discovered facts which entitle him to rescind." *See Vill. Northridge*, 237 P.3d at 602. Monfort raises in his opposition to summary judgment an additional theory of fraudulent inducement: that he was induced into signing the Release because Defendants had always intended to terminate him to cancel his stock options. Opp'n at 21–22; Monfort Decl. ¶¶ 14, 17. Monfort argues that, because he did not have knowledge of this purported fraud until he was terminated in March 2018, his conduct beforehand does not support ratification of the Release. Opp'n at 22–23. Defendants allege that this new theory of fraudulent inducement contradicts Monfort's prior representations, and Defendants urge the Court to disregard this theory. *Id.* The Court holds that Monfort's untimely and contradicted theory does not preclude a finding that he ratified the Release.

Specifically, Monfort first alleged in his First Amended Complaint that he was fraudulently induced into signing the Release by Defendants' misrepresentations that the Disputed Agreements did not exist. FAC ¶ 74–78. Nonetheless, in his opposition, Monfort raises some additional background facts of which he claims to have been unaware at the time he signed the Release. Opp'n at 22–23. For example, Monfort claims that he "did not know, and could [not] know, that . . . [n]o other shareholder . . . [was] required to rescind or pay cash for their shares."

11

*Id.* at 23. But Monfort does not argue that these allegations *induced* his agreement to the Release, *see id.*, which makes his lack of knowledge of these allegations immaterial to the analysis at hand. *See Zimmer*, 87 Cal. App. 2d at 532 (explaining that the "fundamental test of ratification by conduct" requires an assessment of whether the party acted "with full knowledge of the *material facts entitling him to rescind*" (emphasis added)). However, Monfort also claims in his opposition, "If I had known Adomani was planning on firing me after the IPO and cancel my stock options, I would have never signed the Employment Agreement . . . ." Monfort Decl. ¶ 14; *see* Opp'n at 21–22. Thus, the Court must first consider whether Monfort may now assert a theory that he was fraudulently induced into signing the Release because Defendants' had intended to cancel his stock options by terminating him.

First, the Court holds that this new theory of fraudulent inducement is untimely. Monfort's opposition appears to be the first time in the record that Monfort ever claimed that he would not have signed the release had he known that the company would terminate him and cancel his stock options. *See* Opp'n at 21–22. In fact, Monfort's sole evidentiary support for his newly asserted theory is a September 25, 2019 declaration in support of his opposition to summary judgment, in which Monfort stated, "If I had known Adomani was planning on firing me after the IPO and cancel my stock options, I would have never signed the Employment Agreement and would not have stayed under Adomani's employ." Monfort Decl. ¶ 14. A plaintiff's "adding a new theory of liability at the summary judgment stage would prejudice the defendant," and courts may decline to consider new theories during summary judgment. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). The Court finds that Monfort's new theory of fraudulent inducement is not properly before the Court because it is untimely.

Additionally, even if Monfort's new theory were timely, it is flatly contradicted by his prior representations and thus fails to raise any genuine dispute of material fact as to his ratification of the Release. Monfort's only allegation of fraudulent inducement in the First Amended Complaint was the alleged misrepresentation about the existence of the Disputed Agreements. FAC ¶¶ 74–76. In his deposition, Monfort makes no mention of any other

United States District Court
Northern District of California

representation inducing his signing of the Release, other than, "I would have never signed [the Release] if I knew my subscription agreements were fully executed." ECF No. 82–1, Wolf Decl., Ex. D ("Monfort Dep."), at 70:21–25. Most tellingly, in response to an interrogatory directly asking Monfort to "identify every representation that allegedly fraudulently induced" his signing of the Release, Monfort identified only Defendants' representations "that no documentation existed evidencing Plaintiff's ownership of more than 30 million shares of common stock." Wolf Decl. 2d Ex. L, at 11.[5] Courts need not consider a new affidavit that contradicts sworn testimony or interrogatory answers. *See Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993). Thus, because Monfort's untimely theory of fraudulent inducement also contradicts his prior representations, the Court need not consider it.

Because Monfort's only properly alleged theory of fraudulent inducement is that Defendants misrepresented that the Disputed Agreements did not exist, the Court finds that Monfort knew by July 19, 2016 all of the facts giving rise to his right to rescind. Monfort claims that he was repeatedly told in May and June 2016, prior to signing the Release on June 23, 2016, that "the [Disputed Agreements] did not exist." *See, e.g.*, Monfort Decl. ¶ 13. He states that, as a result, "I became convinced that they had either been misplaced or destroyed, or that my memory of the agreements being memorialized in writing was inaccurate." *Id.* As discussed above, Monfort has consistently stated that he would not have signed the Release on June 23, 2016 had he known that Defendants had copies of the Disputed Agreements. FAC ¶¶ 74–76; Wolf Decl. 2d Ex. L, at 11; Monfort Dep. 70:21–250. However, Monfort admitted that he received the Disputed Agreements from Defendants in an email sent by Menerey dated July 19, 2016. Monfort Dep. 77:18–78:12, Ex. 11. Under Monfort's own theory of fraudulent inducement, his receipt of the Disputed Agreements revealed that Defendants' representation that the Disputed Agreements did not exist was false. *See* FAC ¶ 74–76. This discovery would have been sufficient grounds for him

---

[5] Monfort objects to Defendants' submission of Wolf Decl. 2d Ex. L on the grounds that it violates the rule of completeness. ECF No. 104. However, Monfort acknowledges that the "missing page" was previously submitted to the Court, at ECF No. 82-1. Accordingly, the Court overrules Monfort's objection.

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to rescind the 2016 Employment Agreement and the Release. Accordingly, there is no genuine dispute that Monfort had "full knowledge" of his right to rescind by no later than his receipt of the July 19, 2016 email, and that the Court may therefore consider Monfort's conduct thereafter until the filing of the instant lawsuit on August 2, 2018 to determine whether they gave rise to "a reasonable inference" of ratification. *See* Zimmer, 87 Cal. App. 2d at 532.

Monfort cites *Warfield v. Richey*, 167 Cal. App. 2d 93 (1959), to argue that, because Monfort had only "piecemeal indicia of Defendants' fraud in July 2016," he did not need to rescind the Release at that time. The Court finds *Warfield* inapposite. In *Warfield*, the plaintiffs and the defendant entered into a lease agreement for a hotel and motel, based in part upon the defendant's misrepresentation about the prior year's income. *Id.* at 95–96. The plaintiffs delayed rescinding the agreement for months while they requested that the defendant disclose their records of the prior year's income. *Id.* at 98. However, the plaintiff did not learn the truth about the prior year's income until the trial, and the truth about the other fraudulent acts "were coming to the plaintiff's piecemeal." *Id.* Thus, because the plaintiffs never had any full knowledge that would give rise to their right to rescind during the delay, the court found that the plaintiffs could still seek rescission at trial. *Id.* Here, there is no dispute that, by July 19, 2016, Monfort fully knew of the falsity of Defendants' purported representations about the existence of the Disputed Agreements. *See* Monfort Dep., Ex. 12 at 1 ("[H]ere are the original agreements that they told me didn't exist. LOL !!!"). Thus, unlike in *Warfield*, Monfort indisputably had "full knowledge" of his right to rescind as of July 19, 2016, long before he first attempted to do so by filing the instant suit on August 2, 2018. *See Warfield*, 167 Cal. App. 2d at 98.

In sum, because the Court need not consider Monfort's new theory of fraudulent inducement, the Court finds that there is no genuine dispute that Monfort had "full knowledge of the material facts permitting rescission" by no later than July 19, 2016. *See Zimmer*, 87 Cal. App. 2d at 532.

### 2. Monfort's actions after learning of his right to rescind

After Monfort's July 19, 2016 discovery of the alleged fraud, Monfort's conduct

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

unequivocally demonstrates that he intended to ratify the Release.  There is no genuine dispute that Monfort continued to reap the benefits of the Release even after he learned the truth about the Disputed Agreements.  Monfort received the $200,000 payment earmarked as "consideration for . . . execution of [the] general release," and has not returned it.  *See* Monfort Dep., Ex. 10, at 2; Kanning Decl., Ex. E.  Monfort also continued to bill for and receive $7,000 monthly payments as further consideration for the Release.  *See, e.g.*, Menerey Decl., Ex. V (March 2017 and April 2017 invoices).

Even more significantly, Monfort repeatedly induced Defendants' and other parties' reliance on the Release by facilitating the company's reincorporation and initial public offering. From August 2016 to March 2017, Monfort signed and approved numerous documents that reaffirmed his ownership of only 4 million shares of stock, such as in his pre-IPO questionnaire, where he crossed out his ownership of 34 million shares of common stock and wrote in that he owned 4 million.  Monfort Dep., Ex. 13 at 15; *see also* Menerey Decl, Exs. I–K, M, X.  Monfort voted to reincorporate Adomani in Delaware, Menerey Decl. Exs. N–O, and approved a Merger Agreement in which the Disputed Agreements were not assumed by the new Delaware entity, *see* Menerey Decl., Ex. P at 19–20, 26.  The company successfully reincorporated and went public, and Monfort again represented in August 2017 his ownership of only 4 million shares of stock in public filings with the SEC.  Monfort Dep., Ex. 16 at 2.  For years after he learned that the Disputed Agreements existed, Monfort took actions consistent with the Release, which ultimately formed the basis of decisions taken by countless third parties, including IPO underwriters, NASDAQ, and public investors.  *See, e.g.*, Monfort Dep., Ex. 13 at 6 ("The information supplied by you in this Questionnaire will be used to help [Adomani] prepare correct and complete disclosures and to verify that we are in compliance with Nasdaq . . . listing standards.").  After over two years have passed and countless parties have relied on Monfort's release of his claims to over 30 million shares of stock, the Court finds as a matter of law that it would be inequitable to now allow him to rescind the Release.  *See Gill v. Rich*, 128 Cal. App. 4th 1254, 1265 (2005) ("[T]here can be no rescission where the rights of third parties would be prejudiced.") (quoting

*Angle v. United States Fid. & Guar. Co.*, 201 Cal. App. 2d 758, 763 (2001)).

Given the more than two years that passed after Monfort first learned of his right to rescind, and considering his course of conduct in the interim facilitating Adomani's reincorporation and initial public offering, the Court finds that Monfort ratified the Release as a matter of law.

**B. The Release Extends to the Individual Defendants**

Monfort argues that the Release does not extend to the individual defendants because "the intended scope of the [R]elease is ambiguous" and extrinsic evidence signals that the Release was not intended to cover non-signatories. Opp'n at 18. Defendants argue that Monfort cannot escape the explicit terms of the Release, which plainly covers the individual defendants. Reply at 9–10. The Court agrees with Defendants.

The Release is attached to the 2016 Employment Agreement as Attachment A. *See* Monfort Dep., Ex. 10, at 2–3. By its terms, the Release covers "claims related to breach of contract, tort, wrongful termination . . . or claims for any form of compensation, benefits, equity, or other ownership." *Id.* The Release explicitly states that Monfort "generally releases and forever discharges the Company, its parent, subsidiary, affiliated and related entities, *and its and their respective officers, directors, employees, shareholders, contractors, consultants*. . . from any and all claims, liabilities, demands . . . whether known or unknown, arising at any time prior." *Id.* at 5 (emphasis added). The Court finds the Release to be unambiguous as to its application to third parties, including the individual defendants.

Monfort cites *Epic Communications* to argue that, even where a release clause unambiguously extends to third parties, the contract read as a whole may signify a narrower meaning. Opp'n at 18–19 (citing *Epic Commc'ns, Inc. v. Richwave Tech., Inc.*, 237 Cal. App. 4th 1342 (2015)). In *Epic*, the court rejected a broad interpretation of the release clause because "several other provisions of the settlement agreement containing the release clause are not easily reconciled with its seemingly broad language." *Id.* at 1345. For example, the court observed that the introductory recitals to the settlement agreement described a particular dispute and pending

arbitration. *Id.* at 1350. The court further identified a "smoking gun": "This Agreement shall be binding upon, inure to the benefit of and be enforceable by [the parties to the agreement], and their respective successors and assigns . . . . No other person or entity other than the Parties hereto shall be entitled to claim any right or benefit under this." *Id.* at 1350–51 (emphasis omitted). The *Epic* court found a facial ambiguity in the agreement because those provisions were clearly at odds with a broad release. *Id.* at 1349.

Here, by contrast, Monfort is unable to identify any language in the Release whatsoever that contradicts the explicit intent of the Release. At best, Monfort argues that the purpose of the agreement was narrow because it pertained to his "continuing employment with the Company." Opp'n at 18–19; Monfort Dep., Ex. 10, at 1. This falls far short of the type of contradictory language in *Epic* that suggested a narrow intention to settle specific claims. *See Epic*, 237 Cal. App. 4th at 1350–51. Absent any "cogent reason . . . to question [the Release's] literal accuracy as an expression of the parties' intent," the Court may not search beyond the four corners of the Release. *See id.* at 1345. Accordingly, the Court finds that the Release covers claims against the individual defendants.

In sum, because Monfort ratified the Release, the Court finds that it remains operative and that it covers any claims against both Adomani and the individual defendants that arose prior to Monfort's execution of the Release on June 23, 2016. *See* Monfort Dep., Ex. 10, at 5.

### C. Monfort's Claims

Defendants move for summary judgment as to Counts One, Two, and Three, and ask the Court to dismiss Count Four. Specifically, as to Counts One, Two, and Three, Defendants argue that the Release bars almost all of Monfort's claims, and that there are no genuine disputes of material fact as to any claims that survive the Release. Mot. at 11–25. As to Count Four, Defendants argue that the Court should dismiss Count Four in its entirety because declaratory relief would be "superfluous." Mot. at 25. The Court addresses each of Monfort's claims in turn.

#### 1. Count One: Breach of Contract

In Count 1, Monfort's breach of contract claim against Adomani, Monfort alleges breach

United States District Court
Northern District of California

1   of the Disputed Agreements (agreements (1)–(5) below) and the Option Agreements (agreements

2   (6) and (7) below):

3       (1) August 6, 2012 stock subscription agreement for 2,000,000 shares of common stock;

4       (2) August 7, 2012 stock subscription agreement for 9,500,000 shares of common stock;

5       (3) August 7, 2012 stock subscription agreement for 9,000,000 shares of common stock;

6       (4) August 22, 2012 stock subscription agreement for 10,000,000 shares of common stock;

7       (5) September 11, 2012 stock subscription agreement for 7,500,000 shares of common stock;

8       (6) November 1, 2012 option agreement to purchase 7,500,000 shares of common stock; and

9       (7) June 1, 2014 option agreement to purchase 3,000,000 shares of preferred[6] stock.

10  FAC ¶¶ 52–58. Collectively, Monfort claims that these agreements awarded him over 30 million

11  shares of common stock and 15 million stock options, but that he received only 4,000,000 shares

12  of common stock and was never able to exercise any of his stock options. *Id.* ¶¶ 52–61.

13  Defendants claim that the Release bars Monfort's allegations that Adomani breached the Disputed

14  Agreements, and that no triable issue exists as to breach of the Option Agreements. Mot. at 11

15  n.13, 21–25. The Court first considers Defendants' arguments about the Disputed Agreements,

16  before turning to Defendants' arguments about the Option Agreements.

17      First, the Court agrees that the Release bars Monfort's allegations that Adomani breached

18  the Disputed Agreements. Defendants explain that the Disputed Agreements, which are the stock

19  subscriptions for up to 38 million shares of stock, were the very subject of the parties' negotiation

20  that led to the 2016 Employment Agreement and the Release. Mot. at 20. Monfort does not argue

21  otherwise. Indeed, the terms of the Release explicitly include breach of contract claims arising

22  prior to June 23, 2016, when the Release was signed. *See* Monfort Dep., Ex. 10, at 5.

23  Accordingly, because Monfort released any claims to ownership of stock under the Disputed

24  Agreements, there is no triable issue as to breach of the Disputed Agreements.

25      Additionally, the Court finds that no genuine dispute exists as to Monfort's allegations that

26

27  _____
    [6] As the Court noted *supra* note 2, Adomani later converted these options to purchase preferred
    stock into options to purchase common stock.

28
                                                    18

Adomani breached the Option Agreements. Defendants concede that the Release does not apply because the Release predates the purported breach of the Option Agreements when Adomani cancelled Monfort's stock options upon his termination in March 2018. Mot. at 11 n.13; *see* Opp'n at 12–14. However, Defendants argue that summary judgment on this claim is appropriate because no triable issue of fact exists as to whether Monfort was terminated "for cause" as defined by the Option Agreement. Mot. at 23–25. Monfort responds that whether Adomani terminated his employment for cause, which allowed Adomani to cancel his stock options, is a "classic jury question" that cannot be resolved on a motion for summary judgment. Opp'n at 12–14. The Court agrees with Defendants.

At the time of his termination, Monfort had been awarded a stock option for the purchase of 15 million shares of the company's common stock. Menerey Decl., Ex. A–B, Ex. N at 4–11. The Option Agreements incorporate the terms set forth in the 2012 Common Stock Option Plan, which contains a clause terminating an employee's options "if a Participant's employment or other relationship with the Company is terminated for "Cause.'" Di Ricco Decl., Ex. C. at 12. Specifically, the 2012 Common Stock Option Plan states:

> For purposes of the Plan, "Cause" is conduct, as determined by the Board, involving one or more of the following: (i) willful misconduct by the Participant which is injurious to the Company; or (ii) the commission of an act of embezzlement, fraud or deliberate disregard of the rules or policies of the Company which results in economic loss, damage or injury to the Company; . . . or (vi) the failure of the Participant to perform in any material respect his or her employment or engagement obligations without proper cause therefor.

*Id.* at 12–13. Monfort argues that California law implies a covenant of good faith in the board's determination of whether "Cause" existed, and that a jury should decide whether Adomani acted in good faith. Opp'n at 12.

As an initial matter, the Court applies Florida law to this claim. The 2012 Common Stock Option Plan clearly specifies that Florida law governs the "provisions of the Plan and all Awards made" thereunder. Di Ricco Decl., Ex. C. at 18. Quizzically, both parties cite, without explanation, to California law for the substantive contract law governing this claim. *See* Mot. at 23–25; Opp'n at 12–14. However, Florida law would apply to this claim if the choice of law

United States District Court
Northern District of California

provision is enforceable. To determine the "enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state, in this case California." *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009). "Such choice of law provisions are usually respected by California courts." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464 (1992). Thus, the Court will apply Florida law to Monfort's claim that Adomani breached the Option Agreements.[7]

"Florida's implied covenant of good faith and fair dealing is a gap-filling default rule. It is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Overseas Inv. Grp. V. Wall St. Electronica, Inc.*, 181 So. 3d 1288, 1291 (Fla. Dist. Ct. App. 2016) (quoting *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. Dist. Ct. App. 2004)). Where no standards exist in the contract to govern a party's exercise of discretion, a Florida court will likely uphold the party's exercise of its discretion "[u]nless no reasonable party in the [party's position] would have made the same discretionary decision." *Publix Super Mkts.*, 876 So. 2d at 654. Accordingly, if the Option Agreements include standards to govern the board's determination that Monfort was terminated for "Cause," then the Court need not imply a covenant of good faith into the Option Agreements.

The Court finds that the Option Agreements in fact contain standards to restrict the board's discretion as to what constitutes "Cause," and that the implied covenant of good faith and fair dealing therefore does not apply under Florida law. Unlike other contracts where Florida courts have found the implied covenant of good faith to be dispositive, the Option Agreements in this case list several grounds constituting "Cause," which clearly restrain Adomani's board from unbridled exercise of its discretion. *Compare* Di Ricco Decl., Ex. C at 12–13 (listing seven different grounds that constitute "Cause") *with Publix Super Mkts.*, 876 So. 2d at 653–54 (holding

---

[7] The Court notes that, even if California law applied, the Court would still grant Defendants' motion for summary judgment on Monfort's claim that Adomani breached the Option Agreements.

20

that implied covenant of good faith applied to contract giving party absolute discretion to withhold consent for new construction). Given the explicit terms of the Option Agreements, the Court finds that no gap-filling is required and the implied covenant of good faith does not apply.

Because the board's exercise of discretion was governed by the standards in the Option Agreements rather than any implied covenant of good faith, the Court finds that there is no triable issue as to whether Adomani breached the Option Agreements with Monfort. At best, Monfort attempts to relitigate the circumstances of his termination. Opp'n at 13. He calls into question the motivations for the independent party's investigation and flags the suspicious timing of the investigation. *Id.* But, ultimately, Monfort does not dispute that Adomani's offered reasons for his termination meet the standards for "Cause" as set forth in the 2012 Common Stock Option Plan, nor that such termination would terminate his stock options. *See* Di Ricco Decl., Ex. C at 12. For example, Monfort does not contend that the investigation's conclusion that he had failed to "provide appropriate delivery of services," including "cost overruns, missed deadlines, very late delivery, poor quality of work, and poor customer service," Sniderman Dep., Ex. 1, at 5, would not constitute "Cause" as defined by the Option Agreements, Di Ricco Decl., Ex. C at 12. Because Monfort does not otherwise raise any facts to show how Adomani's termination of his options failed to comply with the express terms of the Option Agreements, Monfort has failed to raise a triable issue as to breach of these agreements.

Because no genuine dispute of material fact exists as to Monfort's breach of either the Disputed Agreements or the Option Agreements, the Court GRANTS Defendants' motion for summary judgment as to Count One.

### 2. Count Two: Fraud

In Count 2, Monfort's fraud claim against the individual defendants, Monfort alleges a number of purported misrepresentations regarding Monfort's ownership of common stock and stock options, most of which he alleges occurred before the Release was signed on June 23, 2016. FAC ¶¶ 65–72; *see, e.g.*, *id.* ¶ 66(i) (alleging "oral representations beginning in 2014 through early 2016 . . . that Monfort was and would remain the majority shareholder in Adomani"). The terms

21

of the Release bar allegations of fraud that occurred before the Release was signed. Monfort Dep., Ex. 10, at 5 (releasing Adomani and its employees from "claims related to breach of contract [or] tort," regardless of "whether [the claims are] known or unknown, arising at any time prior"). Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Monfort's allegations of fraud occurring prior to his execution of the Release on June 23, 2016.

However, Monfort's First Amended Complaint identifies three allegations of fraud that occurred after the Release was signed:

> (1) "by oral representations in March of 2014 through 2017 . . . Williams and Kanning [represented] that Monfort would continue as the largest shareholder, that he would 'hold [Reynolds'] hand,' and that Monfort would not lose his stock position or 'power;'"
>
> (2) "by Option Agreement on 6/1/14 through 2017, [Defendants represented] that Monfort was the owner of an option to purchase 3 million shares of preferred stock at $0.10;" and
>
> (3) "by Option Agreement on 11/28/16, signed by Menerey[, Defendants represented] that Monfort was the owner of an option to purchase 3 million shares of common stock at $0.10."

*Id.* ¶ 66(ix), (x), (xiv). Because these three misrepresentations purportedly occurred after the Release was signed, the Court finds that they are not barred by the Release. Thus, the Court must determine whether these alleged misrepresentations raise triable issues as to Monfort's claim of fraud.

First, Monfort alleges that "Williams and Kanning [represented] that Monfort would continue as the largest shareholder, that he would "hold [Reynolds'] hand," and that Monfort would not lose his stock position or "power." FAC ¶ 66(ix). However, in his opposition and supporting declaration, Monfort drops these purported misrepresentations without further explanation. Accordingly, the Court considers them abandoned. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir.2009) (affirming that claim was abandoned when party failed to address them in either his opposition or his own motion for summary judgment).

The other two post-Release allegations merely amount to reiterations of his claims that

22

Adomani breached the Option Agreements. Specifically, Monfort alleges that Defendants misrepresented "by Option Agreement on 6/1/14 through 2017, that Monfort was the owner of an option to purchase 3 million shares of preferred stock at $0.10;" and misrepresented "by Option Agreement on 11/28/16, signed by Menerey that Monfort was the owner of an option to purchase 3 million shares of common stock at $0.10." *Id.* ¶ 66(x), (xiv); *see* Opp'n at 14–15. Defendants argue that summary judgment is appropriate because the economic loss doctrine precludes Monfort from raising these breach of contract allegations as tort claims. Mot. at 20. The Court agrees.

The economic loss rule provides that a party must generally "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Food Safety Net Servs. V. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1130 (2012).[8] The California Supreme Court has explained that "conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Erlich v. Menezes*, 981 P.2d 978, 983 (Cal. 1999). "Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'" *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 273 (2004) (quoting *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999)). California thus proscribes tort claims unless the asserted duty "is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.*

Here, the Court finds that the economic loss rule precludes Monfort from bringing his surviving allegations of fraud. He fails to show how that breach violates some "independent" duty arising outside of the context of those contracts. *See Erlich*, 981 P.2d at 983. Similarly, Monfort fails to "demonstrate harm above and beyond a broken contractual promise." *See Food Safety*, 209 Cal. App. 4th at 1130. Monfort explicitly references the Option Agreements as the source of

---

[8] Unlike Monfort's breach of contract claim, for which the Court applied Florida law pursuant to a choice of law provision, *see supra* Section III.B.1, no choice of law provision covers Monfort's tort claims. The parties apply California law, and the Court does the same.

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the misrepresentations. *See, e.g.*, FAC ¶ 66(x) ("*By Option Agreement* on 6/14/14 through 2017, that Monfort was the owner of an option to purchase 3 million shares of preferred stock at $0.10" (emphasis added)). Thus, Monfort cannot assert these breaches as freestanding fraud allegations.

Moreover, even under a generous reading of Monfort's opposition,[9] the Court identifies only two other alleged misrepresentations that occurred after the Release was signed on June 23, 2016 and that would therefore survive the Release: (1) Reynolds's November 23, 2016 email stating that "no one in this company [] has 19,000,000 shares either owned or optioned except you, and (2) Menerey's November 6, 2016 email, which Monfort claims misrepresents that Monfort "would 'of course' be able to sell his stock and exercise his options after the IPO in November 2016." Opp'n at 15 (citing ECF No. 87, ("O'Connor Decl."), Exs. R, S). As above, these purported misrepresentations speak directly to Monfort's ownership of the common stock and options, and "there is no fraud without the contractual breaches he alleges." Reply at 10. Monfort does not show how these purported misrepresentations "violate[d] a duty independent of the contract." *See Erlich*, 981 P.2d at 983. Accordingly, the Court finds that the economic loss rule applies and that Monfort's cannot assert independent tort claim for any of his remaining allegations of fraud. The Court GRANTS Defendants' motion for summary judgment as to the remainder of Count Two, Monfort's fraud claim.

### 3. Count Three: Fraudulent Inducement

As to Count 3, Monfort's fraudulent inducement claim, Monfort's ratification of the Release as a matter of law precludes him from now asserting a fraudulent inducement claim. "Under California law, in order to bring a claim released by a settlement agreement, a plaintiff must rescind the agreement." *Kennedy v. Columbus Mfg., Inc.*, No. 17-CV-03379-EMC, 2018 WL 1911808, at *4 (N.D. Cal. Apr. 23, 2018) (citing *Vill. Northridge*, 50 Cal. 4th at 917–18)).

---

[9] Throughout his opposition, Monfort's myriad footnote citations fail to include pincites and instead refer the Court to voluminous exhibits. As Defendants point out, Reply at 1, the Court needs not "comb through the record to find some reason to deny a motion for summary judgment." *Gordon v. Virtumondo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) (quoting *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

The California Supreme Court reasoned that allowing a party to "sign a release, keep the money, and then sue . . . for alleged fraud without rescinding the release . . . would violate the terms of the bargain and frustrate its purpose." *Id.* at 931. Here, because the Court found that Monfort ratified the Release and may no longer pursue rescission, the Release effectively bars his claim for fraudulent inducement.[10] Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Monfort's claim of fraudulent inducement.

### 4. Count Four: Declaratory Relief

In Count Four, Monfort's claim for declaratory relief as against all defendants, Monfort seeks declaratory relief regarding his "contractual entitlement to, and/or ownership of, 40,000,000 shares of common stock and options to purchase 15,000,000 shares of common stock." FAC ¶ 83.

The parties acknowledge that Monfort's entitlement to declaratory relief rises and falls with his other claims for relief under the common stock and option agreements. Specifically, Defendants argue that "[a]djudicating Defendants' Motion for Summary Judgment will dispose of all the issues raised in Monfort's request for declaratory judgment." Mot. at 25. Plaintiff's only response is that "because an actual controversy exists between Adomani and Plaintiff relating to their respective rights and obligations under the Disputed Agreements, Defendants are not entitled to summary judgment on Plaintiff's Count [Four] for declaratory relief." Opp'n at 11 n.79. Because Defendants essentially argue that no genuine dispute exists as to Monfort's entitlement to declaratory relief, the Court construes their request for dismissal as a request for summary judgment.

The Court concludes that summary judgment is appropriate as to Monfort's claim for declaratory relief. The Court already granted summary judgment in favor of Defendants as to Counts One, Two, and Three of Monfort's First Amended Complaint. *See supra* Sections III.B.1–

---

[10] For the same reason, Monfort's citation to *Persson* is unavailing. Opp'n at 16–17 (citing *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1153 (2005)). In *Persson*, the trial court awarded damages by partially rescinding the release provision. 125 Cal. App. 4th at 1153–54. There was no argument in that case that the plaintiff had ratified the release as the Court found here, which renders any rescission-based remedy unavailable to Monfort.

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

3. In light of these holdings, there is no genuine dispute remaining as to Monfort's entitlement to 40,000,000 shares of common stock and 15,000,000 stock options. The Court accordingly GRANTS summary judgment in favor of Defendants as to Count Four.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment as to Count One (breach of contract), Count Two (fraud), Count Three (fraudulent inducement), and Count Four (declaratory relief).

**IT IS SO ORDERED.**

Dated: November 25, 2019

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No. 18-CV-05211-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT